MURPHY *v.* EWING.

SWAMP LANDS—SUIT TO QUIET TITLE.—Complaint avers that the lands in controversy were donated to the state of *Indiana* as swamp lands, by act of Congress of *September* 28, 1850; that afterward, by virtue of an act of the legislature of *Indiana*, approved *February* 14, 1851, and other acts supplemental thereto, on or about the —— day of *November*, 1852, plaintiff applied to the register of the *United States* land office at *Jeffersonville, Indiana*, to purchase said lands, and then and there received from the register a certificate of purchase, and presented the same to the receiver of said land office, and paid him the purchase price for said lands, $300, which he received as payment in full, and gave plaintiff a duplicate certificate and receipt. On the same day, the register transmitted the certificate and receipt to the auditor of state, and the purchase money to the treasurer of state. Thereupon, on the 24th day of *November*, 1852, said auditor of state issued to plaintiff a certificate, certifying that said receiver of the land office had deposited with the treasurer of state the sum of $300 for said lands. On the 17th day of *December*, 1852, the governor of the state of *Indiana* conveyed, by patent or deed, said lands to plaintiff, in due form of law. Said sale was in all things in conformity with the laws of the state and of the *United States.*
*Held*, that the complaint shows a valid title.

APPEAL from the *Jackson* Circuit Court.

ELLIOTT, J.—*Ewing*, the appellee, sued *Murphy*, the appellant, to quiet title to lands. *Murphy* demurred to the complaint; his demurrer was overruled, to which he excepted. He then filed an answer and cross complaint, to which *Ewing* replied in denial. Trial by jury; finding for *Ewing*. Motion for new trial by *Murphy* overruled, and excepted to. Judgment for the plaintiff below. *Murphy* appeals.

The evidence is made part of the record by bill of exceptions. The errors assigned are:

"1. The court erred in overruling the demurrer to the complaint.

"2. The court erred in giving the several instructions to the jury, to which the defendant at the time excepted.

"3. The court erred in refusing to give the several instructions prayed for by the defendant.

"4. The court erred in refusing to instruct the jury to find specially on the several points, as requested by the defendant.

"5. The verdict of the jury is contrary to the evidence."

The averments in the complaint are, in substance, as follows: That the lands described in the complaint, situate in *Jackson* county, were donated to the state of *Indiana* as *swamp* lands, by act of Congress, approved *September* 28, 1850; that afterward, under and by virtue of an act of the legislature of the said state of *Indiana*, approved *February* 14, 1851, and other acts supplemental thereto, said plaintiff, on or about the —— day of *November*, 1852, applied to the register of the *United States* land office at *Jeffersonville*, *Indiana*, to purchase said lands, and then and there received from said register a certificate of purchase, and presented the same to the receiver of said land office, and paid him the purchase price therefor—to-wit: the sum of $300—which he received in payment in full for said lands, and gave said plaintiff a duplicate certificate of purchase and receipt; that thereupon the register, on the same day, transmitted to the auditor of state said certificate and receipt, and said register also transmitted said purchase money to the treasurer of state; that thereupon, on the 24th day of *November*, 1852, said auditor of state issued to the plaintiff a certificate, certifying that said receiver of the land office had deposited with the treasurer of state said sum of $300 for said lands; that, on the 17th of *December*, 1852, the governor of the state of *Indiana* conveyed, by

patent or deed, the said lands to the plaintiff in due form of law; that the said sale to the plaintiff of said lands "was in all things made in conformity to the law of the state of *Indiana* and of the *United States.*" The deed was filed and made an exhibit in the complaint; and it is averred that the plaintiff thereby became the legal owner of said lands in fee-simple, and entitled to the possession thereof.

The complaint further avers that afterward, on the 14th day of *September*, 1853, the defendant, with full knowledge of the plaintiff's title to said lands, pretended to purchase the same of the auditor and treasurer of *Jackson* county, as swamp lands, at and for the price of $314.80, and procured said auditor to issue to him a certificate of purchase therefor; that on the same day the defendant presented said certificate of purchase to the treasurer of *Jackson* county, and paid to him the said sum of $314.80, the purchase money for the lands, and procured said county treasurer to issue to him a duplicate certificate or receipt therefor, and further procured the said treasurer to forward to the auditor of state a certified copy of the same. Upon which the auditor of state prepared a deed, in due form, for said lands to the defendant, which was executed by the governor and attested by the secretary of state; that said deed was then forwarded to the treasurer of *Jackson* county, and by him delivered to the defendant. The complaint then alleges that said pretended title of the defendant is a *cloud* upon the plaintiff's good title; that the defendant, who is not in possession of the lands, is disturbing the plaintiff in regard to the possession and enjoyment thereof. Prayer that the defendant's pretended title be adjudged and declared null and void; and that he be enjoined from in any way asserting the same against the plaintiff; that the plaintiff's title be quieted, and for general relief.

Are these averments sufficient, *prima facie*, to entitle the plaintiff to relief? is the first question presented for our

consideration. It is not free from embarrassments, while its solution involves most of the other questions presented in the case. The decision of the question depends upon the construction to be given to certain legislative enactments, relating to the sale of the *swamp* lands, granted to the state by the *United States*.

By the act of Congress, entitled "An act to enable the state of *Arkansas* and other states to reclaim the ' swamp lands' within their limits," approved *September* 28, 1850, the whole of the swamp and overflowed lands, made unfit thereby for cultivation, remaining unsold at the passage of the act within the state, were thereby granted to the state. The act also made it the duty of the secretary of the interior to make out an accurate list and plat of the lands described as aforesaid, and transmit the same to the governor of the state, and at the request of the governor cause a patent to be issued to the state therefor; and on that patent the fee-simple to said lands should vest in the said ' state, subject to the disposal of the legislature thereof, etc. 1 G. & H. 737.

The legislature of this state passed an act, entitled "An act to provide for defraying the expenses of selecting the overflowed and swamp lands in the state of *Indiana*, and for other purposes," approved *February* 14, 1851. Acts of 1851, p. 110. This act does not, in terms, declare that the swamp lands in the state had, prior to its passage, been ascertained or selected; but in its provisions for settling with sundry officers and agents employed in selecting and designating the overflowed and swamp lands in the state, under said act of Congress, it is clearly to be inferred that such selections had been made, or at least were then in process of being made. The 5th section of that act provides, " That said lands, so granted as aforesaid by the *United States* to the state of *Indiana*, after the selections made, under the orders of the governor, shall have been confirmed by the proper department of the federal government, shall be subject to entry at the same prices as the public lands

of the *United States,* in the several land districts of this state.

Sec. 6. " That said lands shall be subject to such entry at the several *United States* land offices in the state, and the several registers of said offices are hereby authorized, as state registers, to issue applications for the purchase of said lands, or any part thereof, which said applications shall be presented to the several receivers of said offices, who are hereby authorized as state receivers, upon the presentation of said applications and reception of the same, and the proper sum of money, at the prices above designated, to give to the purchaser a certificate or duplicate of purchase, which shall entitle said purchaser to a patent for said land, to be hereafter provided for and issued."

Sec. 11 provides that such receivers shall pay over, under the direction of the state treasurer, monthly, all money in his hands arising from such sales into the state treasury, etc.

Sec. 12. "The register of each land office shall monthly transmit to and file in the office of the auditor of state, all certificates and receipts for the sale of land and payment of money therefor, issued by the receivers of said land office of his district, which shall be registered by said auditor."

It may be here observed that there is no provision in the act of Congress requiring the land offices to be closed, or any of the lands in the various districts withheld from entry, until the "lists and plats" of said "swamp lands" should be made out and transmitted to the governor of the state. It is presumed therefore that said lands continued subject to entry at the various land offices until such lists were made out, or the swamp lands selected, and the selections approved.

In fact, it is to be inferred from the 15th section of the act of the General Assembly of the state, before referred to, that such entries had continued, and hence, that section required that the treasurer of state should apply to the

proper department of the government of the *United States*, and demand and receive the price of, and purchase money received by the *United States*, or thereafter to be received, for lands sold by the *United States* since the passage of said act of Congress, " which land vested in the state by virtue of said act," and that upon the receipt of said money, the state relinquished all right and claim to the lands so sold by the *United States*, and thereafter the title should be vested in the purchasers thereof, in fee-simple. That act was in force from and after its passage. It was approved *February* 14, 1851, and the complaint avers that *Ewing* made his entry of the lands described in his complaint, under its provisions, in *November*, 1852. In view of the period of time that intervened from the passage of the act of Congress, *September* 28, 1850, to the date of *Ewing's* purchase, it would seem but reasonable to infer that " the selections made under the order of the governor " had been confirmed, " by the proper department of the federal government," prior to the date of *Ewing's* purchase.

In 1852 the legislature of the state passed an act, entitled " An act to regulate the sale of swamp lands donated by the *United States* to the state of *Indiana*, and to provide for the draining and reclaiming thereof, in accordance with the condition of said grant." Approved May 29, 1852. 1 G. & H. 597.

By this act, the auditor and treasurer of each county are appointed agents, on the part of the state, to sell the swamp lands lying within their respective counties. To effect that object, it is made the duty of the auditor of state, " as soon as possible after the state shall receive her patent from the *United States*" for said lands, to cause maps or plats of all swamp lands lying within the bounds of each county, separately to be prepared, and forwarded to and filed in the office of the county auditor of the proper county. The minimum price is fixed at $1.25 per acre, and the lands are required to be offered at public sale before they are subject to private entry. The

47th section recognizes the fact that persons had deposited money with the receivers of the *United States* land offices in this state for the entry of swamp lands, under the act of the 14th of *February*, 1851; and provides that such persons may enter such lands of the proper county auditor, at any time before the offer of the same at public sale, by complying with certain requirements of that section. It also contains this proviso: "*Provided, further*, that in all cases contemplated in this section, if the holders of the certificate or certificates of entry, at any land office, shall present to the auditor and treasurer of the county in which the land shall be situated a certificate, signed by the auditor of state, certifying therein that the money deposited with the receiver has been paid into the state treasury, in payment of the land mentioned in said certificate, it shall be their duty to enter the same on their books as sold to said holder, and certificates of purchase to issue as if the money had been paid into the office of the county treasurer; and in all such cases no other evidence shall be required."

Section 53 is as follows: "All laws conflicting with the provisions of this act, and all laws heretofore passed authorizing any disposition or sale of the swamp lands, be and the same are hereby repealed."

Another act was passed by the same legislature, and approved *June* 14, 1852, supplemental to the last-recited act. 1 G. & H. 606. The *first* section of which makes it the duty of the auditor of state, by circular letter to the registers and receivers of all the land offices of the *United States*, in this state, requesting them severally to forward to his office and to the state treasurer a certified statement of all the swamp lands for which applications had been made for entry at their respective offices, accompanied with deposits of money for the payment of the same, specifying the name of the person or persons making such deposit, when made, and the description and quantity of land so sought to be entered.

Sec. 2. "That the receivers of said land offices be at the same time requested to pay over to the state treasury all moneys they may have received as aforesaid, and the state treasurer is hereby required to receive the same."

Sec. 3. "That it shall be the duty of the auditor of state, after such money is paid into the treasury, and the statement required by the first section of this act is filed in his office, to issue his certificate to the person or persons whose deposits have been paid into the treasury as aforesaid, certifying the description and quantity of the land so purchased, the name or names of the persons so purchasing, and the amount of money paid therefor."

The fourth section provides for the execution of deeds, on the certificate of the auditor of state, etc. These acts constitute part of the revision of 1852, and were published for the first time therein; and, as they contain no emergency clause, were not in force until the 6th of *May*, 1853. The act of *February* 14, 1851, was therefore in force at the time *Ewing* made his entry and deposited his money. The money was promptly paid by the receiver of the *United States* land office to the treasurer of the state, accompanied by the proper certificates; and whether the "selections made under the order of the governor" had or had not been "confirmed by the proper department of the federal government" at the time of *Ewing's* entry, is not, as we conceive, material as affecting his title. The acts of 1852, to which we have referred, we think clearly embrace all cases where entries had been made, or application therefor, accompanied by deposits of the money, and secured to all persons coming within the provisions thereof proper titles to the lands so paid for. The complaint in this case shows that all the provisions of these acts were fully complied with before they came into force. The case, however, is none the less embraced within their provisions by that reason. They, in effect, ratified and confirmed his title when they took effect.

We think, therefore, that the demurrer to the complaint was correctly overruled.

The answer and cross complaint of the defendant simply deny the plaintiff's title, and set up title in the defendant, in the same manner stated in the complaint. The Circuit Court seems to have regarded the plaintiff's title as valid, as a purchase of the lands from the general government, and so instructed the jury. We have carefully examined the evidence in the case, and find that it very fully sustains the plaintiff's title under the view we have taken of the law. We think the finding and judgment below are clearly correct, which renders it unnecessary that we should examine the other questions presented.

The judgment of the Circuit Court is affirmed, with costs. To be certified, etc.

*R. Crawford*, for appellant.

*William K. Marshall*, for appellee.