The State *v.* The Portsmouth Savings Bank.

Judgment affirmed.

Filed May 24, 1886.

———◆———

No. 12,138.

THE STATE *v.* THE PORTSMOUTH SAVINGS BANK.

SWAMP LANDS.—*Act of Congress 1850 a Present Grant.*—The act of Congress of September 28th, 1850, relating to swamp lands, was a present grant, subject to identification of the special parcels coming within the description.

SAME.—*Beaver Lake Lands.—Selection and Identification.*—The selection by the State, confirmed by the act of Congress of January 14th, 1873, releasing to the State the lands known as the bed of Beaver lake, furnished the identification and perfected the title of the State to those lands, and the title thus confirmed related back to the date of the grant.

SAME.—*Authority of Officers to Sell State's Lands.—Ratification.*—Public officers have no authority to dispose of the State's lands except such as is conferred by positive statute, and sales without such authority are void, unless ratified.

SAME.—*Unsurveyed Lands not Subject to Sale.*—Neither under the act of the Legislature of 1851 (Acts 1851, p. 110), nor under the act of 1852 (1 G. & H. 597; 1 R. S. 1876, p. 952), by which the former was repealed, could the officers of the State sell swamp lands until they had been surveyed and platted.

SAME.—*Grantee of Lands Bordering on Lake Took Thereby no Title to Latter.*— The conveyance by the State in 1853 of the surveyed tracts of swamp lands bordering on and surrounding the unsurveyed lands constituting the bed of Beaver lake carried no title or interest in the latter to the grantee, and no constructive possession thereof.

106 435
136 660
106 435
137 122
106 435
141 199
141 221
106 435
145 48
145 228
146 539
106 435
150 28
106 435
159 467
190 US466

SAME.—*Estoppel of State.*—The acceptance by the State of· a conveyance to a part of the lands constituting the bed of such lake from one who, claiming to own such bed as riparian proprietor, by virtue merely of patents from the State conveying the lands bordering thereon, had made a private plat of the same, and an act of the Legislature providing for the sale of the lands so accepted, do not estop the State to assert title to the remainder of the lake bed.

SAME.—*State not Estopped by Collecting Taxes on its Lands.*—Unauthorized acts of ministerial officers, in assessing taxes upon such lands and collecting the amount from those claiming them, will not estop the State to assert its title, even though the sums collected have been appropriated to the public use.

SAME.—*Standing by and Allowing Improvements.—Notice of Title.*—The State can not be estopped from asserting title to its lands by standing by and permitting improvements to be made thereon, where its title is equally well known to, or equally open to the notice of, both parties.

SAME.—*Adverse Possession.—Lands Covered by Water.—Statute of Limitations.* —Possession without color of title is limited to the particular land over which the claimant exercises palpable acts of ownership. A naked assertion of title to the bed of a lake, almost wholly covered by water, is not sufficient to put the statute of limitations in operation.

SAME.—*Action by State to Recover Land.—Defendant May File Cross Complaint.* —Although the State can not be sued, yet, when it goes into the courts to recover property, it goes as any other suitor, and the defendant is entitled to file a cross complaint and have the title litigated and quieted.

From the Newton Circuit Court.

*F. T. Hord,* Attorney General, *J. B. Julian* and *J. F. Julian,* for appellant.

*T. A. Hendricks, C. Baker, O. B. Hord, A. W. Hendricks, A. Baker, E. Daniels, S. P. Thompson* and *E. L. Urmston,* for appellee.

ZOLLARS, J.—Beaver lake is situated in Newton county, some four miles south of the Kankakee river. In 1850, and for a few years thereafter, the lake was a body of water covering about seventeen thousand acres of land, and averaging from five to seven miles in length, and from two to four miles in width. There was eight feet of water at the deepest place. From this place the water gradually became more shallow, until at the margin it was not over a couple of inches deep. There was an island in the lake of about one hundred acres,

on about forty acres of which there was growing timber, the balance being marshy. The lake was surrounded on all sides by swamp lands. These lands, so bordering on the lake, had been surveyed and platted, and were subject to private entry. In making the survey, the same was extended around the lake to its margin, and a meandering line established. No part of the lake had been, nor has it been surveyed, its whole interior, except the island, having been covered with water. Pursuant to an act of Congress, passed on the 28th day of September, 1850, known as the Swamp Land Act, these border lands, by a proper designation, were patented to the State. After receiving the patents for these lands, and before selling any of them, the State surveyed and located a ditch to drain the lake into the Kankakee river, which was some forty feet lower than the lake. With the completion of the ditch in the spring of 1854, the water was lowered and so receded as to expose upon an average, forty feet of the bed of the lake around the margin. Commencing at the river, for three and three-fourths of a mile, the ditch was about sixteen feet wide and from two to four feet deep. Through a sand ridge near the margin of the lake the ditch was some fifteen feet deep. The average width of the ditch is now about fifty feet, and the average depth is about eight feet, except through the sand ridge, where it is twenty-four feet deep. This increased width and depth is mainly the result of the action of the water. The increased depth and width of the ditch has had the effect to more completely drain the lake.

On the 21st day of November, 1853, the State conveyed, by patent or patents, to John P. Dunn and Amzi B. Condit, the swamp lands surrounding and adjacent to the lake. The conveyance or conveyances described the border lands by government subdivisions, and did not, in terms, include any of the unsurveyed bed of the lake. They took possession of and commenced paying taxes on said marginal tracts. On the 13th day of December, 1856, Dunn and Condit conveyed the same real estate to Michael G. Bright.

The State claims, and by this action seeks to recover, a portion of the bed of the lake, which appellee claims to own as a remote grantee of Bright.

Appellee resists the claim of the State, and, among other contentions to be hereafter noticed, insists: *First.* That the Swamp Land Act of Congress, *ex proprio vigore,* carried to the State the title to the bed of Beaver lake. *Second.* That the conveyance of the border lands by the State, to Dunn and Condit, carried the bed of the lake and the island in the lake.

As appellee's title upon either of its theories is dependent upon the title that the State may have had, it becomes necessary to ascertain when and how the State became the owner of the bed of the lake. The act of Congress of September 28th, 1850, known as the Swamp Land Act, is as follows:

"*Be it enacted,* * * * That to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands, made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be, and the same are hereby, granted to said State.

"Sec. 2. *And be it further enacted,* That it shall be the duty of the secretary of the interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid, and transmit the same to the governor of the State of Arkansas, and, at the request of said governor, cause a patent to be issued to the State therefor; and on that patent, the fee simple to said lands shall vest in said State of Arkansas, subject to the disposal of the Legislature thereof: *Provided, however,* That the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied, exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains, aforesaid.

"Sec. 3. *And be it further enacted,* That in making out a list and plats of the land aforesaid, all legal subdivisions, the greater part of which is 'wet and unfit for cultivation,' shall

be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom.

"Sec. 4. *And be it further enacted,* That the provisions of this act be extended to, and their benefits be conferred upon, each of the other States of the Union in which such swamp and overflowed lands, known and designated as aforesaid, may be situated." 9 U. S. Statutes at Large, 519; 1 G. & H. 737.

There are many decisions by the different courts of the land interpreting the above act. They are not all in harmony, nor is the reasoning in all of them very explicit or satisfactory. There is a line of decisions, supported by plausible arguments, holding that the title to the swamp lands remained, and still remains, in the United States, and did not, and has not passed to the States, except as the lists and plats have been made and approved by the secretary of the interior, and, as held in some of them, patents issued as provided in sections 2 and 3 of the act. *Wright* v. *Roseberry,* 63 Cal. 252; *Grantham* v. *Atkins,* 63 Ill. 359; *Thompson* v. *Prince,* 67 Ill. 281; *Stephenson* v. *Stephenson,* 71 Mo. 127.

It is proper to observe here that the Supreme Court of Illinois has abandoned the doctrine of the cases above cited, following in the later cases what that court conceived to be the holding of the Supreme Court of the United States. *Keller* v. *Brickey,* 78 Ill. 133. It is not certain that this case does not go beyond the holding by the United States Supreme Court. See, also, *Bristol* v. *Carroll County,* 95 Ill. 84.

The earlier ruling in Illinois seems to be in harmony with the later cases above cited. See *Whiteside County* v. *Burchell,* 31 Ill. 68.

On the other hand, it seems to have been held in some of the cases that the Swamp Land Act, *ex proprio vigore,* passed to the States the fee simple title to all the swamp lands, without any segregation or patent.

In the case of *Fore* v. *Williams,* 35 Miss. 533, it was held

that the Swamp Land Act, from its passage, vested the absolute title in the State to all the swamp lands, as fully and completely as if the act had designated the lands by specific description; that nothing further was necessary to enjoy the grant but to locate the lands as swamp lands, and thereby render the subject of the grant certain, and that such location was the sole purpose of the 2d section of the act.

Some of the cases hold that while the Swamp Land Act of 1850 operated as a present general grant to the States of the swamp lands therein situated, yet, without the selection of the lands as such, and the approval of such selection by the secretary of the interior, as provided in the 2d and 3d sections of the act, the States acquire no title to any particular tract that they could or can convey to a purchaser. *Funston* v. *Metcalf,* 40 Miss. 504. This case interprets the case of *Fore* v. *Williams, supra,* as so holding. Others, not going quite so far, hold that, while the Swamp Land Act made a grant *in prœsenti,* and vested the title in the States to all the lands coming within the description, and that when they are properly designated and ascertained, the grant relates to the date of the act, yet the States can not convey title to any particular tract until it has been properly selected as swamp land, and the selection approved by the secretary of the interior. *Hendry* v. *Willis,* 33 Ark. 833; *Fletcher* v. *Pool,* 20 Ark. 100.

Other cases hold, that the Swamp Land Act operated, *ex proprio vigore,* to convey the title to the swamp lands to the States; that the selection and patent under sections 2 and 3 of the act are necessary only for the purpose of fixing the location and description, and that the States may provide for the disposal of such lands before they have been selected or patented. *Allison* v. *Halfacre,* 11 Iowa, 450.

In the case of *Iowa R. R. Land Co.* v. *Antoine,* 52 Iowa, 429, the plaintiff claimed title under a railroad grant, and introduced in evidence the commissioner's certificate approved by the secretary of the interior. It was held that parol evidence was not admissible in behalf of the defendant, having

no evidence of title, to impeach the plaintiff's title by showing that the land was in fact swamp land, and hence passed under the prior swamp land grant.

In the case of *Railroad Co.* v. *Fremont County*, 9 Wall. 89, it was held that after the passage of the Swamp Land Act, the only important steps to be taken to perfect the title in the States were the ascertainment and designation of the several subdivisions which fell within the description of swamp lands as defined in the third section of that act, and that this duty was cast upon the secretary of the interior as the head of the land department.of the government.

In the case of *Railroad Co.* v. *Smith*, 9 Wall. 95, in speaking of the Swamp Land Act, it was said: "Now, here is a present grant by Congress of certain lands to the States within which they lie, but it is by a description which requires something more than a mere reference to their townships, ranges, and sections." In that case it was held, by a divided court, that the swamp lands in a State were not covered and carried by a subsequent grant to a railroad company, which excepted from its operation "all lands heretofore reserved by any act of Congress, or in any manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatever;" and that parol evidence might be resorted to for the purpose of showing that a particular tract of land was swamp land within the meaning of the Swamp Land Act, and hence not covered nor carried by the railroad grant, the secretary of the interior not having made or approved of the plat designating the land as swamp land. Upon this branch of the case the court said: "By the second section of the act of 1850 it was made the duty of the secretary of the interior to ascertain this fact (that the land was swamp land), and furnish the State with the evidence of it. Must the State lose the land, though clearly swamp land, because that officer has neglected to do this? The right of the State did not depend on his action, but on the act of Congress, and though the

States might be embarrassed in the assertion of this right by the delay or failure of the secretary to ascertain and make out lists of these lands, the right of the States to them could not be defeated by that delay."

In speaking of the former case of *Railroad Co.* v. *Fremont County, supra,* it was said: "In the former case the plaintiff, claiming under the swamp land grant, was bound to establish his title by such evidence as Congress may have determined to be necessary to make the title complete in the State, or the grantee of the State, to which the lands were supposed to be granted, otherwise the plaintiff established no legal title. In the present case it is not necessary to defeat the title under the railroad grant to show that all the steps prescribed by Congress to vest a complete title in defendant, under the swamp land grant, have been taken. It is sufficient to show that this land which is now claimed under the railroad grant, was reserved out of that grant, and this is done whenever it is proved by appropriate testimony to have been swamp and overflowed land, as described in the act of 1850." What was said in this case, of course, should be limited to the case before the court. It has been so limited in subsequent decisions by that court.

In the case of *French* v. *Fyan,* 93 U. S. 169, it was said: "This court has decided more than once that the Swamp Land Act was a grant *in præsenti,* by which the title to those lands passed at once to the State in which they lay. * * * The patent, therefore, which is the evidence that the lands contained in it had been identified as swamp lands under that act, relates back and gives certainty to the title of the date of the grant."

In speaking of the duty devolved upon the secretary of the interior by the 2d section of the Swamp Land Act, it was further said: "We are of the opinion that this section devolved upon the secretary, as the head of the department which administered the affairs of the public lands, the duty, and conferred on him the power, of determining what lands were of the de-

scription granted by that act, and made his office the tribunal whose decision on that subject was to be controlling."

It was accordingly held that parol evidence could not be heard to show that the lands selected and patented by the secretary of the interior as swamp lands, were, in fact, not such.

In the case of *Martin* v. *Marks*, 97 U. S. 345, in speaking of the procuring of evidence of title in the States to the swamp lands, granted by the Swamp Land Act, it was said: " We also held in previous cases that, when this was ascertained and the lands were identified by proper authority, the title related to the date of the grant, namely, September 28th, 1850, and superseded any subsequent grant or evidence of title issuing from the United States." This language, again, must be limited to the case before the court.

The case involved the Swamp Land Act, and the act of 1857, which was an act providing that the selection of swamp lands theretofore made and reported to the commissioner of the general land-office, so far as such lands remained vacant and unoccupied, and not interfered with by actual settlement under existing laws of the United States, should be confirmed and approved, and the lands so listed should be patented to the several States in conformity with the provisions of the Swamp Land Act as soon as practicable, etc. 11 U. S. Statutes at Large, p. 251.

In speaking of those acts it was said : " The act of 1850 was a present grant, subject to identification of the specific parcels coming within the description ; and the selections confirmed by the act of 1857 furnished this identification, and perfected the title."

It was further said that if any question had been made, it would probably have been necessary, in support of the title under the Swamp Land Act, to prove that the list of the swamp lands was on file with the commissioner of the United States land-office at the time the act of 1857 was passed.

In the case of *Rice* v. *Sioux City, etc., R. R. Co.*, 110 U.

S. 695, the general statement was again made, that the Swamp Land Act of 1850 operated as a grant *in præsenti*, to the States then in existence, of all the swamp lands in their respective jurisdictions.

In the case of *Ehrhardt* v. *Hogaboom*, 115 U. S. 67, the patent for a tract of land was issued under the preemption laws. The defendant, in order to overthrow this title under the patent, proposed to show by parol that the land was swamp land, and hence passed to the State under the Swamp Land Act of 1850. It was held that such evidence was incompetent; that it is the duty of the land department, of which the secretary of the interior is the head, to determine whether land patented to a settler is of the class subject to settlement under the preemption laws, and that his judgment as to this fact is not open to contestation in an action at law.

In the case of *Cahn* v. *Barnes*, 7 Sawyer (C. Ct. U. S. Dis. Oregon), 48, one of the parties claimed the lands under the Swamp Land Act, and the other under another grant from the State, and a patent from the government based upon that grant. The material question in the case was, whether the patent for the premises was conclusive evidence in the action that they belonged to the wagon road grant, and not to the swamp land grant. It was said : " The swamp land grant was a grant *in præsenti* of all the swamp * * lands in the State, * * * but the determination of what lands come within this category, and what do not, rests with the secretary of the interior, and his decision is final. * * * The power to ultimately determine what land passes under the grant as being 'wet and unfit for cultivation,' rests with the secretary." It was accordingly held, that the patent was conclusive evidence at law that the premises were included in the wagon road grant, and were, therefore, not swamp lands, the latter conclusion being a necessary element of the former, and that, therefore, parol evidence was not admissible to show that the lands were swamp lands.

In the case of *State of Ind.* v. *Milk*, 11 Fed. R. 389, in-

volving the lake in question here, GRESHAM, J., said : " Section 2 of the swamp land act provided that if the greater portion of any subdivision was wet or overflowed lands, the whole subdivision should be embraced in the grant, and it was left to official discretion what, if any, of the subdivisions surrounding a lake were within the grant. But there was no doubt as to the character of the bed of Beaver lake : it was overflowed land, and as such the title to it was vested in the State. This lake was indicated upon the government surveys and maps, and nothing remained to show that its bed was overflowed land within the meaning of the act."

The correct doctrine to be gathered from the foregoing cases, and especially from the decisions by the Supreme Court of the United States which are authoritative upon the construction of Federal Statutes, seems to be the following :

*First.* The swamp land act of 1850, *ex proprio vigore*, was a grant *in præsenti* to the States of all the swamp lands therein situated. This proposition is further supported by the doctrine declared in the cases of *Schulenberg* v. *Harriman*, 21 Wall. 44, and *Hall* v. *Pickering*, 40 Maine, 548.

*Second.* Whether or not any particular tract of land was or is swamp land, within the terms of the grant, was and is a question for the decision of the secretary of the interior.

*Third.* His decision upon that question, when once made, is final and conclusive, and can not be questioned or overthrown by parol evidence.

*Fourth.* It is not necessary that the decision of the secretary, that any particular tracts of lands were or are swamp lands, should be evidenced by a patent to the State. It is sufficient that the lands have been selected as such, and the selection approved by that officer.

*Fifth.* When such selection has been approved by that officer, and the particular tracts of land thus identified as swamp lands, the title relates to the date of the grant, namely, September 28th, 1850.

*Sixth.* A patent to the State for swamp lands, issued by the

secretary of the interior, is evidence that the designated tracts were properly selected as swamp lands, and fixes the title thereto as of the date of the swamp land act, namely, September 28th, 1850.

*Seventh.* If the secretary of the interior has not designated any particular tract as swamp land, and has not decided to the contrary, and neglects and refuses to act in the premises as against wrongful claimants, it may be shown by parol, in behalf of the State or those claiming under it, that the land is in fact swamp land. This results from the necessity of the case, as the courts have no power to compel action by that officer. *French* v. *Fyan, supra.* The admission of such evidence is somewhat in line with the rule that admits parol evidence to identify the land intended to be conveyed. *Guy* v. *Barnes,* 29 Ind. 103; *Hammond* v. *Stoy,* 85 Ind. 457; *Rucker* v. *Steelman,* 73 Ind. 396.

*Eighth.* While it may be that the State, in the absence of some statutes of its own to the contrary, might convey its rights to, and interest in, any particular tract of land before it is segregated as swamp land and such segregation approved by the secretary of the interior, the title of such grantee would be liable to be defeated by a decision by that officer that such land was not or is not swamp land within the meaning of the swamp land act of 1850.

Our cases are in harmony with the above deductions. *Hamilton* v. *Shoaff,* 99 Ind. 63; *Matthews* v. *Goodrich,* 102 Ind. 557; *Murphy* v. *Ewing,* 23 Ind. 297; *Edmondson* v. *Corn,* 62 Ind. 17; *Nitche* v. *Earle,* 88 Ind. 375 (379).

On the 11th day of January, 1873, Congress passed the following act:

"An act to release to the State of Indiana the lands known as the bed of Beaver lake, in Newton county, Indiana, in said State.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the lands in Newton county, in the State of Indiana, known as

the bed of Beaver lake, the same having been drained and reclaimed at the expense of the State of Indiana and its assignees, be and the same are hereby released and quitclaimed to the State of Indiana." 17 U. S. Stat. at Large, 409.

The above act, we think, did not carry to the State the bed of Beaver lake; it was granted by the Swamp Land Act of 1850. Under that act nothing was lacking except its identification as swamp and overflowed land.

The above act operated as a recognition of the fact that the State had selected and treated it as swamp and overflowed land, confirmed that selection, and perfected the title as indefeasible.

In analogy to what was said in the case of *Martin* v. *Marks,* *supra,* the act of 1850 was a present grant, subject to identification of the special parcels coming within the description, and the selection by the State, confirmed by the act of 1873, *supra,* furnished the identification, and perfected the title. The title thus confirmed relates back to the date of the Swamp Land Act of 1850.

Having reached this conclusion, it is not necessary to determine as to whether or not the patents from the United States to the State for the lands bordering upon and surrounding the lake, being grants from one government to another, by their own force, carried the bed of the lake. That the State claimed the swamp lands under the act of 1850, as a grant *in præsenti,* even before their segregation, is apparent from its legislation upon that subject. For example, the Legislature granted rights of way over such lands to railway companies. Acts 1851, p. 151. As was done elsewhere, the State, moving upon the theory that under the act of 1850 it was the owner of whatever lands were in fact swamp and overflowed lands, did not wait for action by the secretary of the interior, but provided for their survey, selection and designation by State authority, and claimed payment from the general government for whatever of such lands had been disposed of by it, subsequent to the act of 1850. Acts 1851, p.

110; 1 G. & H. 607, section 2; *Id.* 608, section 1; *Id.* 609, section 3.

These selections, made by State authority, when approved by the secretary of the interior, have almost, if not quite, uniformly been held to be sufficient under the Swamp Land Act of 1850.

It results from the above reasoning and conclusions, that the State has had title to the bed of Beaver lake since the passage of the act of 1850, unless it has in some way divested itself of the title thereto. Has it done so as to the portions which appellee claims as the remote grantee of Bright?

As we have seen, the lake was surrounded on all sides by swamp lands. These lands had been surveyed and platted by authority of the general government, and were subject to private entry. In making the survey, the same was extended around the lake to its margin, and a meandering line established. These border lands, by the government subdivisions, were patented to the State. In the agreed statement of facts it is recited, that on the 21st day of November, 1853, the State conveyed by patent to John P. Dunn and Amzi B. Condit all the marginal fractional forty-acre tracts constituting the contour and rim of the lake. This is all the record discloses upon the subject of the border lands, or any of them, being fractional forty-acre tracts.

It is not shown whether the surrounding swamp lands patented to Dunn and Condit consisted of one row of forty-acre or fractional forty-acre tracts immediately upon the border of the lake, or whether lands back of and adjoining these were also included in the patent. However this may be, it is not, perhaps, very material.

No patent was issued to the State for the bed of the lake, nor has it ever been surveyed or platted by authority of the National or State government. The only plat of it is that made by Bright.

As before stated, the contention of appellee is, that the patent or patents from the State to Dunn and Condit for the

border fractional forty-acre tracts, carried the bed of. the lake, consisting, as we have seen, of near seventeen thousand acres of land.

Soon after the passage of the Swamp Land Act by Congress, the State, by its Legislature, made provisions for the sale and disposal of the swamp lands thereby granted. Acts 1851, p. 110. An examination of this act makes it quite apparent, that under its provisions, the authorized officers could not sell any of the swamp lands until they had been surveyed and properly described by subdivisions, and had been selected and designated as swamp lands. In other words, the Legislature, by that act, made no provision for the sale of unsurveyed and unplatted swamp lands, such as the bed of Beaver lake then was.

Another act, providing for and regulating the sale of swamp lands, was enacted in 1852, and was in force when the patent was made by the State to Dunn and Condit. That act repealed the above act of 1851. I G. & H. 597; 1 R. S. 1876, p. 952.

The act of 1852 constituted the auditor and treasurer of each county, agents on the part of the State to sell the swamp lands situated in their respective counties. The third section provided, that after the State should receive its patents from the United States for the swamp lands, the auditor of state should cause to be prepared maps or plats of all the swamp lands lying within the bounds of each county, separately showing the township, range, section, and parts of sections, together with the numbers of each, in which such lands lay, and forward the same to the different county auditors. Upon receiving the maps or plats, the county auditors were required to give notice of the time and place of sale of the swamp lands. Section 4. He was required to offer the lands for sale at public auction in legal subdivisions, and, as near as practicable, in half-quarter sections. Section 5. He was also required to strike off such tract or tracts to the highest

bidder therefor, for any sum not less than $1.25 for each acre in the tract or tracts, and deliver to the purchaser a certificate stating therein the tract or tracts purchased, the number of acres in the tract or tracts, and the price per acre.   Sections 6 and 7.   The act further required that after payment for any tract or tracts, the county treasurer should give to the purchaser a duplicate receipt stating therein the amount paid for each acre, the number of acres in the tract or tracts, the county, congressional township, range and section, in which they are situated.   Section 9.   The county auditors were required to keep a record of sales, giving therein a description of each tract of land sold, and stating the number of acres contained therein, and the price paid for each acre.   Section 13.   It was further provided, that the swamp lands remaining unsold, after being publicly offered, should be subject to entry at the sum of $1.25 per acre.

Section 29 of the act provided, that the proceeds of the sales of swamp lands, after the payment of the expenses of selling and draining, "shall constitute a portion of and belong to the common school fund of the State as in the Constitution provided."

Here, again, it is apparent that the Legislature, by the above act, made no provision for the sale of the unsurveyed and unplatted swamp lands.

The designated officers were authorized to sell those lands by surveyed, legal, designated, and platted subdivisions, and at not less than $1.25 cents per acre.   In our opinion, if they had attempted to sell the bed of Beaver lake, unsurveyed and unplatted as it was, and the number of acres thereof unknown, their action would have been without authority and void.   Upon such a sale, there would have been no means of ascertaining the price per acre, because the number of acres was unknown.   They could not have sold that land by subdivisions, because it had not been subdivided.   In short, there would have been no way to comply with the various requirements of the act for making sales of swamp

lands. Public officers have no authority to dispose of the State's lands except such as is conferred upon them by positive statute. Any sales of such lands by them without such statutory authority are void as against the State, unless they are in some proper way ratified by the State. *McCaslin.* v. *State, ex rel.,* 99 Ind. 428; *Brown* v. *Ogg,* 85 Ind. 234; *Vail* v. *McKernan,* 21 Ind. 421; *Skelton* v. *Bliss,* 7 Ind. 77; *Ferris* v. *Cravens,* 65 Ind. 262; *Whiteside* v. *United States,* 93 U. S. 247; *Hull & Argalls* v. *Marshall County,* 12 Iowa, 142.

If they might not have sold directly the undefined quantity of land constituting the bed of the lake, it would hardly do to hold that by selling and making patents for the border lands, they indirectly conveyed away seventeen thousand acres of the State's lands, for which, so far as shown by the record, the State received nothing. Especially should this not be held, when it is remembered, that by the terms of the grant to the State, the proceeds from the sale of the swamp lands were to be used by way of draining such lands, and that by the Constitution and statute of the State, the proceeds, after the payment of expenses and drainage, are set apart as a portion of the common school fund. See *Green* v. *Irving,* 54 Miss. 450 (464) (28 Am. R. 360).

The border lands were in a condition to be sold, and the officers had authority to sell them. The bed of the lake was not in a condition to be sold, and hence they had no authority to dispose of it directly or indirectly. Of this lack of authority, Dunn and Condit were bound to take notice. They were bound to take notice of the public records and statutes. Those lands could not have been given away by the officers to the detriment of the school fund, and in violation of the object of the grant. Neither could they be disposed of in any way, except in pursuance of law.

The State held the swamp lands in trust for the people, and the object for which they were granted. Its grants of such lands, therefore, are to be construed strictly. *Wilcoxon* v. *McGhee,* 12 Ill. 381; S. C., 54 Am. Dec. 409; *McManus*

v. *Carmichael,* 3 Iowa, 1; *City of Terre Haute* v. *Terre Haute Water Works Co.,* 94 Ind. 305.

To grant the contention of appellee would be to hold that a grantee from the State of a forty-acre tract of overflowed and swamp land, bordering upon a lake four miles in width, would take by the State's deed, not only the forty acres, but in addition a strip of land as wide as the forty-acre tract and two miles long. Without entering upon a review of the numerous cases upon the subject of riparian rights, we are very clear that the deeds or patents from the State to Dunn and Condit carried to them no more of the swamp and overflowed lands than were included in the several surveyed subdivisions bounded by the lake. As fully supporting our conclusions in this case, and upon the general subject of grants of lands bordering upon natural lakes, we cite the following authorities: *State of Ind.* v. *Milk,* 11 Fed. R. 389; *Boorman* v. *Sunnuchs,* 42 Wis. 233; *State* v. *Gilmanton,* 9 N. H. 461; *Seaman* v. *Smith,* 24 Ill. 521; *Fletcher* v. *Phelps,* 28 Vt. 257; *Mansur* v. *Blake,* 62 Maine, 38; *Wheeler* v. *Spinola,* 54 N. Y. 377; Angell Watercourses, section 41; *Paine* v. *Woods,* 108 Mass. 160; *Diedrich* v. *Northwestern U. R. W. Co.,* 42 Wis. 248 (24 Am. R. 399).

Whether or not this court would, in all cases, as between private parties, apply the doctrine of the above authorities in its strictness and to its full extent, is, a question we need not here determine.

We are cited by appellee's counsel to the cases of *Ross* v. *Faust,* 54 Ind. 472 (23 Am. R. 655), *Ridgway* v. *Ludlow,* 58 Ind. 248, and *Edwards* v. *Ogle,* 76 Ind. 302. These cases are not controlling here. Neither of them involved swamp lands granted by the State. The first involved the rights of riparian proprietors upon an unnavigable river, and in the others their rights were limited by the subdivisions in which their lands were situated. We decide nothing here in conflict with those cases, nor do we, by anything that is said in

the case before us, intend to either extend or limit those cases.

Appellee by counsel contends, in the third place, that by reason of the facts set up in the answer and adduced in evidence, the State is estopped to assert title to the land in dispute, and, in the fourth place, that this action by the State is barred by the statute of limitation.

In order to apply the doctrine of estoppel, we must assume (as we have above held) that the title is in the State, and must inquire whether anything has been done by or in behalf of the State that ought, in law or equity, to estop the State to assert its title. The material facts adduced in evidence, in addition to those already set out, are as follows:

On the 25th day of April, 1857, Bright, claiming to own the bed of Beaver lake as riparian proprietor, made a plat of the same, dividing it into forty-acre tracts and numbering them from one to four hundred and twenty-seven inclusive, asserted his claim thereon, and caused it to be recorded in the records of the auditor of state, and of the county recorder of Newton county.

On the 19th day of July, 1858, the officers of the State authorized Aquilla Jones, as agent for the State, to accept a deed from Bright for the consideration of a debt owing to the State by him of about $6,000, to all the odd numbered alternate lots marked on said plat.

On the 31st day of December, 1860, Jones, as such trustee and agent, made a deed of conveyance for said lots to the State. Each of the several deeds above were properly recorded.

From and after the making of the deed last above, Bright claimed to own the even numbered alternate lots, and offered them for sale. In 1865, the Legislature of the State authorized the sale of the odd numbered alternate lots. Before the year 1862, the State had sold and conveyed all the odd numbered alternate lots, referring in the patents to its source of title; and Bright had sold and conveyed by warranty deeds

all the other alternate lots, as designated on said plat. This statement about the sale of the lots we find in the agreed statement of facts, but it is difficult to see how it can be true, as the State did not authorize the sale until by the act of 1865.

On and after the year 1857, the alternate lots claimed by Bright were each year regularly entered for taxation, and were assessed for State, county and township taxes each year, and the taxes have been paid. On one occasion, Bright brought an action to enjoin the collection of a township tax, but no question was made as to whether or not he had title to the lands. *Bright* v. *McCullough*, 27 Ind. 223.

Since 1857, the lands described in the complaint, being a part of the even alternate numbers claimed by Bright, have been known, described, and designated in conveyances and for taxation by the numbers stated in the complaint as taken from the Bright plat, and have been continuously claimed and in the possession of, as far as the said land could be possessed and used by, the appellee and those under whom it claims title of record.

The lots in suit were sold and conveyed by Bright to Lemuel Milk, and by him to Algy Dean, and by him to appellee. In the deeds, the lands were described by reference to the Bright plat upon the records of Newton county and of the auditor of state. All of the deeds were duly recorded in Newton county.

The several lots of land in suit form a part of the original bed of Beaver lake, and are described in the complaint as in the Bright plat. By this action the State seeks to recover from appellee fourteen of the even numbered alternate lots, amounting in all to five hundred and sixty acres.

While Bright claimed to own the even numbered lots, he extended a small ditch, about one and one-half miles into the lake. Since then, it has been continually enlarged by the action of the water. In 1871 or 1872, the ditch dug by the State filled up with sand at the end near Kankakee river.

This was remedied by persons who owned land near the river, although Milk, who claimed to own the even numbered lots formerly claimed by Bright, seems to have paid a small part of the expense. At that time, he claimed an interest in the bed of the lake, and was farming, ditching, fencing, and grazing cattle upon the redeemed portions.

From 1864 until 1880, Milk had been extending a ditch as the water receded, until he had constructed it to the deepest part of the lake. This ditch, like the others, has been enlarged by the action of the water. At one time, perhaps in 1882, after this action was commenced, Milk did some work in cleaning the State ditch through the sand ridge. He also did some work in removing obstructions from that ditch. Mr. Dean, who claimed to own some of the Bright lots, did some farming and stock raising upon the lands after they were reclaimed. He also did some work in removing obstructions from the State ditch.

By means of the State ditch, and the other ditches extended into the lake, and the side ditches leading into them, the greater portion of the water has been taken from the lake, there remaining a strip about three miles long and three-fourths of a mile wide which is covered with water most of the time.

It is first contended by counsel for appellee, that the State is estopped by reason of the act of 1865. As we have seen, after Bright had platted the bed of the lake, Aquilla Jones, in behalf of the State, accepted from him a deed for each alternate odd numbered lot and conveyed them to the State in 1860. The act was approved on the 12th day of December, 1865. It is entitled, "An act to provide for the sale of certain lands belonging to the State of Indiana, in the counties of Jasper and Newton, and to give pre-emption to actual settlers thereon." The first section of this act is as follows:

"*Be it enacted by the General Assembly of the State of Indiana,* That the lands belonging to the State of Indiana, in the counties of Jasper and Newton, acquired by conveyance

from Michael G. Bright, dated November 19th, 1860, and of Aquilla Jones, December 31st, 1860, shall be offered for sale at public auction, by the auditor and treasurer of the county in which said land may be situated," etc. Acts 1865, Spec. Sess., p. 192.

The State, through Jones, had accepted a conveyance from Bright for the alternate odd numbered lots as designated upon the Bright plat, and the above act provided for their sale. Now why should this act estop the State, as against Bright and his grantees, to afterwards assert title to the alternate even numbered lots which he did not convey to the State? The lots were not accepted by the State in the way of compromise of conflicting claims as to the bed of Beaver lake, nor was the above act passed for the purpose of relinquishing the State's title to the lots not deeded to it by Bright. The agreed statement of facts shows, and it is asserted in the pleadings, that the lots were accepted by way of compromise of a claim of the State against Bright. But whether that or something else was the consideration, can make no material difference here. As to the lots deeded to the State, it may well be said that the State, in accepting the deed, recognized a claim by Bright, the relinquishment of which would be beneficial to the State. The controversy here, however, is not about the lots thus deeded to the State. The above act operated to ratify the acts of Jones in accepting the deed from Bright, and provided for the sale of the lots. It makes no reference at all to the lots not deeded. At that time, Bright had no title at all to any portion of the bed of the lake. The title was in the State. Therefore, to hold that the above act estopped the State to afterwards assert its title to the lots not deeded by Bright, would be to hold, that, properly interpreted, it is equivalent to an affirmative declaration that as to the lots not thus deeded, the title was in Bright. In other words, it would be to hold that, practically, the act invested Bright with title to a large tract of the State's swamp lands, to which, before that act, he had no title at all.

It would be to make that act operate, practically, as an alienation of a large tract of the State's swamp land, for which it would and could receive nothing, and the value of which would be lost to the drainage and school funds. Such, clearly, was not the purpose of the act. Its object, as stated in the title, was to provide for the sale of specific lands then belonging to the State. Neither the title nor the act manifests any purpose to settle conflicting claims to any lands, either affirmatively or negatively. Nor does the act, as we think, amount to an assertion that Bright had title to the lands conveyed to the State. The words, "lands belonging to the State, * * * acquired by conveyance from Bright * * * and Jones," were used more to identify the property. If not words of description merely, they were clearly not used as words of representation which can bind the State as to other lands than those mentioned in the act. In the construction of such acts, nothing should be inferred against the State. *Slidell* v. *Grandjean*, 111 U. S. 412 (437). Indeed, it might well be questioned whether, as against Bright, the State would be estopped to show that the title to the lots conveyed to it by him, was in it, and not in him. See *Osterhout* v. *Shoemaker*, 3 Hill, 513; *Sparrow* v. *Kingman*, 1 N. Y. 242; *Casey's Lessee* v. *Inloes*, 1 Gill, 430; S. C., 39 Am. Dec. 658; *Macklot* v. *Dubreuil*, 9 Mo. 477; S. C., 43 Am. Dec. 550.

If, as against its grantees of the lots deeded by Bright, the State were attempting to show that Bright had no title, we should have an altogether different case, and one to which some of the cases cited by counsel for appellee would be directly applicable.

As we have said, the above act in no way operated as a representation. It neither asserted nor concealed anything as to the title to the lots not deeded by Bright. It can not be known by a mere reading of the act, that it has any reference to any land in the bed of Beaver lake. The conditions of the title to those lots might have been and was as well known to Bright and his grantees, as to the State authorities,

including the Legislature. Whatever title Dunn and Condit and Bright had was of record. Bright's plat, if notice of anything to any ·one, was notice that Bright's only claim to the bed of the lake was as riparian proprietor, through the deed or deeds from the State for the border lands. They were bound to know the law, and hence bound to know that the deeds for the border lands did not carry the bed of the lake. They were bound to know that Beaver lake had not been surveyed and subdivided, and that hence, under the law of 1852, for the sale of the swamp lands, the officers had no authority to sell the bed of the lake. They were also bound to know that the act of 1865 made no provision for the sale of any portion of the bed of the lake, except that deeded by Bright to the State. With this knowledge of the condition of the title, neither Bright nor his grantees were, or are, in a condition to urge an estoppel against the State by reason of the above act. Every element of an estoppel is lacking. *Sims* v. *City of Frankfort*, 79 Ind. 446 (452–3) ; *Foster* v. *Albert*, 42 Ind. 40; *Fletcher* v. *Holmes*, 25 Ind. 458; *Platt* v. *Scott*, 6 Blackf. 389; *Clem* v. *Newcastle, etc., R. R. Co.*, 9 Ind. 488; *Stoddard* v. *Johnson*, 75 Ind. 20; *Lash* v. *Rendell*, 72 Ind. 475; *Robbins* v. *Magee*, 76 Ind. 381; *Brant* v. *Virginia Coal, etc., Co.*, 93 U. S. 326.

Did the assessment of taxes upon the lands in dispute, the collection of the same, and appropriation of the amount collected to public uses, estop the State to assert its title to the land? Bright and his grantees were claiming to own the land, and the taxes were assessed, doubtless, under the mistaken notion on the part of the officers, that the claim was well founded. Those officers, however, were ministerial officers, whose powers and duties were defined by statute. They had no power to bind the State, except when acting within the scope of their authority. The title being in the State, the lands were not taxable. The unauthorized acts of the ministerial officers in assessing taxes upon it, and collecting the amount from those claiming the land, will not ̇estop the

State to assert its title, even though the amount so collected by the officers has by them been appropriated to public uses. *Reid* v. *State, ex rel.*, 74 Ind. 252, and cases there cited; *McCaslin* v. *State, ex rel.*, 99 Ind. 428; *Union School Tp.* v. *First Nat'l Bank*, 102 Ind. 464; *State, ex rel.*, v. *Jones*, 95 Ind. 175; *Pettis* v. *Johnson*, 56 Ind. 139; *Mattox* v. *Hightshue*, 39 Ind. 95; *County of Buena Vista* v. *Iowa Falls, etc.*, *R. R. Co.*, 46 Iowa, 226; *Crane* v. *Reeder*, 25 Mich. 303; *City of St. Louis* v. *Gorman*, 29 Mo. 593; *United States* v. *Maxwell Land Grant Co.*, 21 Fed. R. 19.

It is not improper to observe here that the amount of taxes paid is not shown by the evidence. It is shown by the evidence, as we have seen, that appellee's grantors, during a number of years prior to the commencement of this action, extended ditches from the State ditch into the lake, and, on one or two occasions, did some work in cleaning the State ditch; and that they also built some fences around portions of the land, constituting the original bed of the lake. What the extent of the fencing was is not shown, nor is it shown that any fences were erected upon the specific lands in dispute, nor is it shown either what amount was expended in the way of ditching.

As we have before said, Bright and his grantees were bound to know that they had no title to the bed of the lake. The State has done nothing that will justify a claim upon their part, that they have been deceived or misled. Whatever they expended upon the bed of the lake, therefore, they must be held to have done it with the knowledge that the title to the land was in the State. They could not, by thus improving the State's lands, acquire title to them by estoppel.

In the case of *Casey's Lessee* v. *Inloes, supra,* it was held that the estoppel of one standing by and permitting improvements to be made on his lands by another, without disclosing his title, from afterwards setting up such title, does not apply to cases where the title is equally well known to both parties, or equally open to the notice of both parties. See, also, *St.*

*Louis Smelting, etc., Co.* v. *Green,* 4 McCrary, 232; *County of Buena Vista* v. *Iowa Falls, etc., R. R. Co., supra.*

In the case of *Bryan* v. *Uland,* 101 Ind. 477 (481), in speaking of improvements made upon another's land, it was said : " It is only *bona fide* occupants of lands who have the right to claim the benefit of improvements made while in possession under color of title. Both the appellant and his grantor had knowledge of the appellees' rights, and are, therefore, not within the rule. *Woodhull* v. *Rosenthal,* 61 N. Y. 382." Especially should this doctrine be applied, where it is sought to estop the State, by improvements made upon its swamp lands. In such a case, the rule will be strictly and rigorously applied. *Gray* v. *Bartlett,* 20 Pick. 186 ; S. C., 32 Am. Dec. 208; *Sparks* v. *Pierce,* 115 U. S. 408 ; *Deffeback* v. *Hawke,* 115 U. S. 392; *Union School Tp.* v. *First Nat'l Bank, supra.*

There is nothing in the evidence to show that the State had notice that any improvements were being made upon the bed of the lake by appellee's grantors. It is not shown that any officer or agent of the State, who had any duty to perform in relation to the swamp and overflowed lands, nor that any other agent or officer of the State, had any such notice.

We come now to the question of the statute of limitations, relied upon by appellee. So far as material here, section 211 of the code of 1852, 2 R. S. 1876, p. 122, was as follows : " The following actions shall be commenced within the periods herein prescribed after the cause of action has accrued, and not afterwards : * * * For the recovery of the possession of real estate—within twenty years." Section 224 of that code, 2 R. S. 1876, p. 129, was as follows : " Limitations of actions shall bar the State of Indiana and the United States as other persons."

The agreed statement of facts is, that since Bright had this plat recorded in 1857, the lands described in the complaint have been continuously claimed by appellee and those under

whom it claims title of record, and in their possession, as far as said lands could be possessed and used by them.

Whether or not any of the land in controversy is now under water, is not shown by the evidence. It is shown, however, that until within the last four years the greater part of the bed of the lake has been under water. The most effectual ditching in the bed of the lake was done by Milk, between the years 1864 and 1880.

It was impossible for Bright to have had possession of the bed of the lake, unless he in some way had constructive possession, because, during the time that he claimed to be the owner, it was almost wholly covered with water. He had no grant from the State, nor had he anything else that gave him color of title. Whatever possession he may have had, therefore, was limited to the particular land over which he had and exercised palpable acts of ownership.

In order that the above statute of limitations should run, it was not necessary that there should have been possession under color of title. *Vanduyn* v. *Hepner*, 45 Ind. 589. But possession without color of title is limited to the particular land over which the claimant exercises palpable acts of ownership. *Bell* v. *Longworth*, 6 Ind. 273. In this case it was said: "When a party is in possession of land, claiming an adverse title, the question must always arise, to what extent does his claim reach, what lands does his claim of title cover? And where there is nothing but naked possession to evidence it, his title must, from necessity, be limited to the lands over which he has exercised a visible authority, known to others, as owner; to those, in short, from which he has excluded the former owner and others. A man can not go, solitary and alone, to the prairies or forests of the west, set himself down in the middle thereof, and claim that he possesses all, to an undefined extent, not then actually possessed by some one else. He must be limited to that portion over which. he exercises palpable and continuous acts of ownership, as being the quantity which he claims as his own,

there being no other evidence, in such case, to enable us to determine the quantity." See, also, *Hall* v. *Powel,* 4 S. & R. (Pa.) 456; S. C., 8 Am. Dec. 722; *Riley* v. *Jameson,* 3 N. H. 23; S. C., 14 Am. Dec. 325; *State, ex rel.,* v. *Porter,* 86 Ind. 404.

There is no evidence that Bright ever, at any time, had, or could have had, actual possession of any portion of the land in controversy. The plat of the bed of the lake made by him was a document not known to the law, and hence the record of it was notice to no one. But the making and recording of the plat, and the claim of title thereon asserted, if known to the State, were in no way the equivalent of actual possession of the land, such as would require the State to bring an action for its possession or lose its rights under the statute of limitations.

There is no evidence that Bright's grantors exercised any acts of ownership over any portion of the bed of Beaver lake at any time beyond fifteen years prior to the trial of the action in September, 1884. Indeed, it is not shown that they became the owners of any portion of the land in dispute prior to 1882. Within a period of fifteen years prior to the trial, the bed of the lake was almost wholly covered with water. This action was commenced in January, 1880, and hence, if Bright's grantees became such in 1882, twenty years had not elapsed between their purchase and the commencement of the action.

We have thus considered the case as made by the evidence. It shows that the State became the owner of the bed of the lake by grant from the United States, and does not show or tend to show, as we think, that the State has lost its right and title thereto by any conveyance or grant, nor that it is estopped to now assert that title, nor that the action is barred by the statute of limitations. Appellant's motion for a new trial, therefore, should have been sustained.

The plea under which the defence was made, appellee contends, is a cross complaint to quiet title. Appellant contends

that it is an answer only, and that as the State can not be sued, a cross complaint to quiet title can not be maintained. Although the State can not be sued, yet, when it goes into the courts to recover property, it goes as any other suitor, and must accord to the defendant the right to file a cross complaint and have the title litigated, settled, and quieted. *State, ex rel.,* v. *Board, etc.,* 101 Ind. 69 (74).

From the view we are constrained to take of the case, it is not very material whether the plea be treated as an answer or a cross complaint, although looking to all of its averments and the prayer for affirmative relief, we think that it is, in its essential features, a cross complaint.

It is averred that after making the plat, Bright had the actual and adverse possession of the bed of the lake, but this general averment is declared to rest upon the facts specifically stated. The facts so stated show that the bed of the lake was covered with water; that the possession was only such as he could have by and through his grant and title to the border lands, and that it was, therefore, not actual possession, but what appellee regards as constructive possession, by reason of the ownership of the border lands.

We have already seen that the grant of the border lands and the possession of them by Bright did not give him constructive possession of the bed of the lake. He is, therefore, not shown to have had any possession of the bed of the lake, such as would put the statute of limitations in operation against the State.

It is averred that Bright sold and conveyed away the lands in controversy, on the 8th day of November, 1869. It is thus made manifest that Bright's grantees could not have had twenty years' possession of the land prior to the beginning of this action, on the 17th day of January, 1880. It is not material, therefore, what the averments as to their possession may be, so far as they can affect the question of the statute of limitations.

Upon the question of estoppel, it is sufficient to say that

the case made by the cross complaint is not materially different from that made by the evidence. Upon what has already been said upon that question, and upon an examination of the cross complaint as a whole, we are constrained to hold. that the demurrer thereto should have been sustained. It is certain, that nothing would be lost by a remodelling of the cross complaint.

Judgment reversed, at appellee's costs, with instructions to the court below to sustain appellant's motion for a new trial, and to sustain its demurrer to the cross complaint.

ELLIOTT, J., did not participate in the decision of this case.

Filed May 24, 1886.