Doe on the Demise of the City of Madison *v.* Hildreth.

The original descriptions of the sub-divisions of the public lands made by the surveyor-general from the field-notes or books of the deputy-surveyors, and the plats showing such subdivisions, are evidence as to their boundaries; and duly authenticated copies of such descriptions and plats are also evidence.

It is doubted whether the original field-notes of the deputy-surveyors are evidence as to boundaries; but if they are, they must be controlled by the descriptions and plats made by the surveyor-general.

·In the descriptions of the surveys of the townships of land in this state bordering on the *Ohio* river, the word " *Ohio* " means, *prima facie,* the *Ohio* river.

Nov. Term, 1850.

DOE
v.
HILDRETH.

ERROR to the *Jefferson* Circuit Court.

Tuesday, November 26.

PERKINS, J.—This was an action of ejectment by *Doe* on the demise of the *City of Madison* against *Henry Hildreth,* brought for the recovery of "twenty acres of land lying and being in the county of *Jefferson* and bounded on the north by fractional section number two, in township number three north, of range number ten east, in the *Jeffersonville* land district; on the east by the west line of *Main* street in the *City of Madison;* on the south by the *Ohio* river; and on the west by the line dividing sections numbered two and three in the township and range aforesaid when extended to the *Ohio* river, with the rights," &c. The usual consent-rule was entered, and the cause tried by a jury upon the general issue. Verdict for the defendant. Motion for a new trial overruled, and judgment on the verdict. The evidence is upon the record.

The title of the plaintiff's lessor, the *City of Madison,* was based upon an act of congress, approved *March* 3d, 1847, vesting in said city for her sole use and benefit, "all the right, title, and interest of the *United States* in and to all that unsurveyed strip or parcel of land lying and being in the county of *Jefferson* and state of *Indiana,* bounded as follows, viz., beginning at the south-east corner of fractional section number one; thence westwardly along the south line of fractional sections one, two, and three, all in township three north, of range ten east, until said line strikes the south-west corner of said fractional section numbered three; thence from the corner last mentioned due south to low water mark on the *Ohio* river; thence eastwardly up and following the meanderings of the river at low water mark to a point directly opposite the south-east corner of said fractional section number one; thence north from the point last aforesaid to the place of beginning," &c.

The twenty acres involved in the present suit are embraced in the foregoing description, and constitute a sup-

Nov. Term,
1850.

Doe
v.
Hildreth.

posed unsurveyed strip of land lying between fractional section two, in township three, and the *Ohio* river.

The defendant is the owner, by a patent from the president of the *United States*, of said fractional section two, and rested his defence upon the ground that no such unsurveyed strip of land existed at the passage of the act of congress above mentioned; that fractional section two, owned by him, extended to the *Ohio* river, and embraced, therefore, all the tract of land supposed to be granted by congress to the city, as lying between said section and the river.

If such an unsurveyed strip of land did exist at the passage of said act of congress, the *United States* was its owner, and the act unquestionably conveyed it to the city. If such a strip did not exist, the act conveyed nothing.

If fractional section two extends to the *Ohio* river, such an unsurveyed strip of land did not exist. If fractional section two does not extend to the *Ohio* river, such an unsurveyed strip of land did exist. The main question in the cause, therefore, resolves itself into this: where is the south line of fractional section number two? is it on the *Ohio* river, or some distance north of it? The determination of this question depends upon the laws of the *United States*, and the survey and conveyance of fractional section two, made by her officers, under those laws.

The second section of "an act providing for the sale of the lands of the *United States* in the territory north-west of the river *Ohio*," &c., approved *May* 18, 1796, enacts, "that the part of the said lands which has not been already conveyed," &c., "shall be divided by north and south lines, run according to the true meridian, and by others crossing them at right angles so as to form townships of six miles square, unless where the line of the late *Indiana* purchase, or of tracts of land heretofore surveyed or patented, or the course of navigable rivers may render it impracticable; and then this rule shall be departed from no further than such particular circumstances may require." "One half of the said townships, taking

Nov. Term,
1850.

Doe
v.
Hildreth.

them alternately, shall be subdivided into sections, containing, as nearly as may be, six hundred and forty acres each, by running through the same, each way, parallel lines at the end of every two miles, and by making a corner on each of said lines at the end of every mile; the sections shall be numbered respectively, beginning with the number one in the north-east section, and proceeding west and east alternatively, through the township, with progressive numbers, till the thirty-sixth be completed." "The fractional parts of townships shall be divided into sections in manner aforesaid," &c. The "act concerning the mode of surveying the public lands," &c., approved *February* 11, 1805, provides as follows: "and the boundary lines which shall not have been actually run and marked as aforesaid, shall be ascertained by running straight lines from the established corners to the opposite corresponding corners; but in those portions of the fractional townships, where no such opposite corresponding corners have been or can be fixed, the said boundary lines shall be ascertained by running from the established corners, due north and south, or east and west, lines, as the case may be, to the water course, *Indiana* boundary line, or other external boundary of such fractional township."

By an act of congress, approved 26th of *March*, 1804 the surveyor-general had been required to have "all the public lands," &c., "north of the river *Ohio*," &c., surveyed and divided according to the laws in force, &c. Fractional section two, in question in this suit, was surveyed in 1807. Under the foregoing statutory requirements it is very plain that it was the duty of the public surveyors to make each township six miles square, and each section one mile square, where no obstruction prevented; and that where an obstruction did prevent, it was their duty, in forming fractional townships and sections, to approximate as nearly to such squares as possible—that is, they were to include in a fractional township or section all the land between the obstruction and the opposite boundary of the township or section, as the case might be. In the pre-

sent case, therefore, as township three, even by including all the land below township four, its northern boundary, and the *Ohio* river, an obstruction opposite on the south, would still be fractional—less than six miles square—it should extend to said river as its southern boundary: and as section 2, in said township, by extending from its northern boundary to the river *Ohio* on the south, would still be less than one mile square, it should extend to said river. So far there is no difficulty. Does said section extend to the *Ohio* river, is the question? Before proceeding with this inquiry some questions of evidence will be properly considered. As a part of his evidence to show the boundaries of section two, the plaintiff gave to the jury a copy of the original field-books or notes made by the deputy-surveyors at the survey, certified by the present surveyor-general. The defendant excepted. The defendant, as a part of his evidence to show said boundaries, put in a plat of township three, from the general land office, certified by the commissioner of said office. The plaintiff excepted. He also offered in evidence " a true and literal exemplification of the transcript of the field-notes of the survey of sections one, two, three, and four, in township three north, of range ten east," &c., on file in the general land office, certified by the commissioner under his official seal. The plaintiff objected and the Court refused to admit it in evidence. We will first consider this latter ruling of the Court.

This "exemplification" was a copy of the "description" of the corners and boundaries of the sections, made by the surveyor-general, from the field-notes of the deputy-surveyors who made the survey.

By the second section of the act of congress of 1796, above quoted, it is provided, in regard to these field-notes or "books," as follows: "These field-books shall be returned to the surveyor-general, who shall therefrom cause a description of the whole lands surveyed to be made out and transmitted to the officers who shall superintend said sales." The secretary of the treasury is made, by the fourth and fifth sections of said act, one of the officers who

shall superintend the sales. A description would, there-
fore, be properly transmitted to that officer. By the second
section of "an act concerning the mode of surveying the
public lands," &c., approved *February* 11, 1805, it is de-
clared that "all the corners marked in the surveys re-
turned by the surveyor-general" "shall be established as
the proper corners," &c.; and that "the boundary lines
actually run and marked in the surveys returned by the
surveyor-general," "shall be established as the proper
boundary lines," &c. Story's Laws U. S., vol. 2, p. 960.
By "an act for the establishment of a general land office
in the department of the treasury," approved *April 25th*,
1812, "the commissioner of the general land office" is
created; and in section 5, of said act, it is enacted, "that
the said commissioner shall, forthwith after his appoint-
ment, be entitled to the custody, and shall take charge of
the said seal, and also of all records, books, and papers
remaining in the offices of the secretary of state, of the
secretary and register of the treasury, and of the secre-
tary of war, touching or concerning the public lands of
the *United States;* and the said records, books, and pa-
pers shall become, and be deemed the records, books, and
papers of the said office." Section 9 declares "that all
returns relative to the public lands, heretofore directed to
be made to the secretary of the treasury, shall hereafter
be made to the said commissioner," &c. And, by section
4 of said act, it is provided that "copies of any records,
books, or papers belonging to the said office, under the
signature of the said commissioner, or, when the office
shall be vacant, under the signature of the chief clerk
and the said seal, shall be competent evidence in all cases
in which the original records, books, or papers could be
evidence." 2d Story's Laws U. S. 1238. The original
description of the lands, made by the surveyor-general,
from the field-books or notes of the deputies, would, un-
doubtedly, be evidence. It is by it (in connection with
plats hereafter to be noticed) that the government sells,
and, of course, as a general rule, ought to be bound, and
the law, as we understand it, declares that the lines and

corners laid down in said description shall be the binding ones. This description, then, being evidence, and having been, as we have said, properly transmitted, under the law, (in the present case,) to the secretary of the treasury, and from him to the land office, copies of said description, properly authenticated, must be evidence. We think that offered should have been admitted.

Next, as to the plat which was admitted in evidence. Section 2 of the act of 1796, heretofore quoted, requires that the surveyor-general shall, from the "field-books" of the deputies, in addition to the "description" heretofore mentioned, "cause a fair plat to be made of the townships, and fractional parts of townships contained in the said lands, describing the subdivisions thereof and the marks of the corners. This plat shall be recorded in books to be kept for that purpose; a copy thereof shall be kept at the surveyor-general's office for public information; and other copies sent to the places of sale, and to the secretary of the treasury." By a subsequent law, as we have shown above, the papers, &c., in the office of the secretary of the treasury, pertaining to the public lands, were transferred to the land office, and copies of them, properly authenticated, made evidence. The copy of the plat in this case was rightly admitted.

As to the field-books of the deputy-surveyors, we doubt whether they were admissible in evidence, though we do not decide that they were not. According to the law, after they have been transmitted to the surveyor-general, and he has completed from them his descriptions and plats of the lands surveyed for use in the land offices, no further notice is to be taken of them. The government does not sell her lands by them. The officers who make the sales do not see them. Purchasers do not see them. They form, therefore, no representation by the government to purchasers as to boundaries. But admit that they were admissible in this case as evidence, still as the plat made from them by the surveyor-general was also admissible, and was in evidence, if there was any variance between the plat and field-books, the former must

Nov. Term,
1850.

Doe
v.
Hildreth.

have controled, for it represented the lines and corners as fixed by the surveyor-general, and by which the land was sold; and the law declares that the corners and boundaries as returned *by*, not *to*, that officer, shall be the corners and boundaries. Their admission, therefore, could not have affected the result of the case. We do not, however, think that there was any variance between the "description" offered in evidence, the plat admitted, and the field-notes. It is not denied that both of the former bound the section of land in question on the *Ohio* river. It seems to us that the latter—the field-notes—do also, and without the aid of any parol explanation. They are, so far as is necessary to copy them, as follow:

"Ch. Lk.    Run the line south between sections 1 and 2,
            T. 3 N., 10 E.
2.    62.   Water course 10 links wide, runs S. W.
17.   25.   White oak 12 inches.
24.   25.   Water course 15 links wide, runs S. E.
37.   25.   *Ohio.*  A beech 9 inches, corner tree, from
            which, &c.
Ch.   Lk.   South between sections 2 and 3, T. 3 N., R.
            10 E.
5.    37.   Beech 36 inches.
25.   29.   *Ohio.*  Where a sugar tree 7 inches, &c.
Ch.   Lk.   South between sections 3 and 4, T. 3 N., 10 E.
4.    86.   *Ohio.*  Poplar 24 inches, bears, &c.  Meanders
            of the *Ohio* river in front of sections 2 and
            3, T. 3 N., R. 10 E.  Beginning ——.  Post
            bearing north 200 lks. between sections 3
            and 4," &c.  Then follow the meanders of
            the river.

We think the calls at the south-east and south-west corners of section two, in these notes, are for the *Ohio* river, and that the south line of said section is, by them, said river. These calls and this line govern courses, and distances, and quantity, and make the river the legal boundary. The surveyor-general, therefore, in making, from these notes, plats and descriptions for the land offices and for public inspection, rightly made the river the south-

east and south-west corners of said section, and its south-ern boundary.

This determination upon these points of evidence is decisive of the whole case, for the section being bounded on the south by the *Ohio* river, the grantee, by the common law, would hold to the middle of the stream. But suppose the title of the *United States* extended, under the *Virginia* grant, but to low water mark; or that the decisions made in some of the states are correct, that in grants bounded by our great fresh water navigable rivers, the grantee takes only to low water mark; still it is equally fatal to the plaintiff, for low water mark is the limit of the conveyance to his lessor.

But notwithstanding we have arrived at the decision of the cause, the law making the evidence which we have held admissible, to be, in fact, conclusive also, still, considering the great value of property involved in our decision, and the labor, ability, and learning given to the argument of the case, we deem it proper that we should state more particularly the grounds upon which the plaintiff's lessor, the *City of Madison*, claims a recovery, and the reasons why we think them insufficient.

It was insisted that the field-notes of which we have spoken were legal evidence, and that the "plat" and "description" were not—that the field-notes were uncertain in their language; for instance, that the word "*Ohio*" in them, did not clearly mean the *Ohio* river, nor show that the deputy-surveyors run to it; that in point of fact they did not run to it, but terminated their lines a distance above, and actually run and staked a line as and for the south boundary of fractional section two some ten feet above the water's edge, at high water of the river, as was shown by parol evidence, by which act of the said surveyors it was contended the government was bound.

As to the legality of the field-notes, plat, and description as evidence, we have nothing further to add. As to the word *Ohio* in those notes meaning the *Ohio* river, and constituting a call for it as a corner and a boundary, when used, we have no doubt. The township in which the sec-

tion that the officers were surveying lay bordered on that river; the officers were running towards the river; to complete the sections it was necessary to go to it; the law required them to go it; the word is the proper and full name of the river, and there was no other object in the vicinity called by that name. If the word does not mean the *Ohio* river, what does it mean? And if it was not used as a call for corners and boundaries, why was it used at all? And further, those very field-notes, in giving the south boundary, describe the meanders of the " *Ohio* river," thus explaining, if explanation were needed, what is meant by " *Ohio*" in the east and west lines.

In regard to the alleged line staked by the deputy-surveyors, above the river bank, there is no proof of the fact. It was stated by two witnesses that they had seen stakes upon the bank, but no witness proved who placed those stakes there, when they were placed, nor for what purpose. But had such a line been marked by the surveyors, as it was not returned by them, and never came to the knowledge of the government, was never ratified, and the surveyors were not authorized by law to make it, the government could not be bound by it.

It is further said the corner stakes were planted in the north and south lines from six to ten feet from the river. The answers to this are : 1. That all the surveyors tell us that when they corner upon a water course, they uniformly plant their stakes a few feet back from the stream that they may not be carried away; and 2. The law is that where in a conveyance there are calls for permanent natural objects, and for other transient ones, the calls for the permanent natural objects govern. Angel on Water Courses, 4 Ed., p. 18.

But supposing us to be wrong upon every other point, nevertheless the Court below was bound to decide this cause against the plaintiff, under the laws of congress, upon the plat of the surveyor-general, a copy of which was legally in evidence; for, "when a grant of land refers to a *map* upon which the land is laid down as bound-

ed on a water course, the grantee is entitled to hold *usque ad filum aquæ. Newson* v. *Pryor,* 7 Wheat. U. S. R. 7. In a sale of land in the village of *Oswego,* in the state of *New York,* (by virtue of which the grantee claimed the use of the water to the thread of the river,) the lots were not very particularly described in the certificate of sale; but a map of the village in the office of the secretary of state was referred to, and the lots were sold as laid down on that map. In a bill in chancery by the grantee for a diversion of the water by the canal commissioners, it was stated that the map designated the lots as being mill and water lots; and that the surveyor-general, at the sale, represented the lots as such, and that the purchaser would have the right to use them as such. The construction given by the Court was, that the grant of the lots under the above description and circumstances, included a right to the water course. *Varick* v. *Smith,* 5 Page N. Y. Ch. R. 137. Id. 547. In *Kentucky,* the *plat* of public lands is, by law, a necessary part of the surveyor's report, and it is, therefore, proper evidence in ascertaining the position of the land, and what it includes. It has often happened in that state, that surveyors have one or more lines bounded by streams of water, calling for divers courses as meanders thereof, and the plat itself exhibits the stream as composing such lines; but whenever there is an attempt to run their courses and distances contained in a certificate and patent, they will not follow the stream at all, but widely depart from it; and, in such cases, it is held that the stream must control the courses and distances called for, because *the plat makes the stream the boundary. Reed* v. *Langford,* 3 J. J. Marsh. Ken. R. 420." —Angel on Water Courses, 4 Ed., p. 29.

We see no ground upon which the judgment of the Court below can be reversed.

*Per Curiam.*—The judgment is affirmed with costs.

*J. W. Chapman* and *J. Sullivan,* for the plaintiff.

*M. G. Bright, S. C. Stevens,* and *J. G. Marshall,* for the defendant.