## Case No. 4,950.

### FORSYTH et al. v. SMALE et al.

[7 Biss. 201;[1] 8 Chi. Leg. News, 322; 7 Reporter, 262.]

Circuit Court, D. Indiana. May, 1876.

Baker, Hord & Hendricks, for plaintiffs.
Harrison, Hines & Miller and McDaid & Knight, for defendants.

DRUMMOND, Circuit Judge. Lake George, according to the complaint, is a body of water about two miles long, north and south, and about three-quarters of a mile wide, east and west; its depth is not stated. It is called a non-navigable lake, and it is said that for many years after the survey was made by the United States, in 1835, the lake had no outlet. The plaintiffs are owners of the title from the government of two tracts of land on the east side of the lake, called lots No. 3 and 4, being parts of fractional section 18, in township 37 north, range 9 west, the western boundary of section 18 being most of it in the lake; certainly that part of it immediately west of lots 3 and 4.

Proceeding south on the shore line of the lake, the plaintiffs are owners of parts of section 19, which extend to the southern boundary of the lake; they are also the owners of parts of sections 24 and 13, extending around the lake by its south boundary, and north on its western boundary, so as to include the land immediately opposite lots 3 and 4. The plaintiffs are thus the owners as alleged, of all the land bordering the lake east and west, as well as south, that is to say, south of a line produced west on the northern boundary of lot 3, so as to cross the lake, and it would include all south of that, and on both sides of the lake, as the property of the plaintiffs. The complaint admits that when the survey was made, the lines were run, not upon the water's edge of lots 3 and 4, but they were run in the usual way for the purpose of ascertaining the quantity of land and from point to point near the boundary of the lake,

The complaint alleges that the defendants claim that the boundaries did not include whatever land was left west of lots 3 and 4, between the meandered line and the lake. It is insisted, however, on the part of the plaintiffs, that this meandered line was run simply for the purpose of ascertaining the quantity of land, and not to exclude from that quantity the land between the meandered line and the lake.

The complaint produces and makes part of the pleading two plats, copies of the government survey, according to which it appears that the western boundary of lots 3 and 4 was the lake. There is no land shown on the west between the meandered line and the lake, but the lines are run from the eastern boundary of section 18, and of lots 3 and 4 to the lake, and it is admitted, extending the lines thus surveyed and as marked in rods they would not reach the lake; but this is not shown upon the surveys produced in evidence; on the contrary, as before stated the western line of lots 3 and 4 appears to be the lake. There is no gore or tongue of land represented on lot 3 according to this survey, but the water line is represented to be the ordinary varying line of the lake. The complaint alleges that there is a gore or strip of land extending from lot 3 in a south westerly direction into the lake, and it is in relation to that gore or strip of land that this controversy arises.

Defendants are in possession of that land, and the plaintiffs claim it for the reason as they allege, that whatever land is there is a part of lot 3; at any rate so far as the northern line of lot 3, when produced west, would describe the boundary of that gore or strip of land. The complaint says nothing about the condition of the lake at the time of the survey, whether it is the same now or at the time the suit was brought, as it was at the time of the survey. Whether any changes have taken place in the condition of things does not appear.

The first question to be determined is, whether the boundaries of lots 3 and 4 did extend to the lake, or whether, on the other hand, they did not include more or less of land which might be left between the meandered line and the lake, and, I think, upon the face of the pleadings as they stand when

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

connected with the maps, we must assume that the boundaries extended to the lake.

It seems to me that the principles which are decided by the supreme court of the United States in the case of Railroad Co. v. Schurmeir, 7 Wall. [74 U. S.] 272, must to a great extent control this case. That was a case where there was a tract of land surveyed on the Mississippi river; a meandered line was run, outside of which was the tract of land in controversy in the case, which was claimed by the railway company, by virtue of a grant from the government to the state of Minnesota, but which was also claimed by the party who had entered the land bounded by the river. That line was run just as this was, with a meandered line upon the river, and the party purchased the land of the government as so much land, and took his patent for it, and the question was, whether the patent included the land outside of the meandered line, and which was sometimes covered with water and sometimes bare. The supreme court held that the patentee had the better right to the land because his patent covered the land in controversy. The meandered lines were run for the purpose of ascertaining the quantity of land, but the intention of the government was to leave the river as the boundary of the land, and the court says (Railroad Co. v. Schurmeir, 7 Wall. [74 U. S.] 286-289):

"Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser.

"In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows, to a demonstration, that the water course, and not the meander line, as actually run on the land, is the boundary.

"Proprietors, bordering on streams not navigable, unless restricted by the terms of the grant, hold to the center of the stream; but the better opinion is, that proprietors of lands bordering upon navigable rivers, under titles derived from the United States, hold only to the stream, as the express provision is, that all such rivers shall be deemed to be, and remain public highways. * * * *

"Rivers were not regarded as navigable in the common law sense, unless the waters were affected by the ebb and flow of the tide, but it is quite clear that congress did not employ the words 'navigable,' and 'not navigable,' in that sense, as usually understood in legal decisions. On the contrary, it is obvious that the words were employed without respect to the ebb and flow of the tide, as they were applied to territory situated far above tide waters, and in which there were no salt water streams. Viewed in the light of these considerations, the court does not hesitate to decide, that congress, in making a distinction between streams navigable and those not navigable, intended to provide that the common law rules of riparian ownership should apply to lands bordering on the latter, but that the title to lands bordering on navigable streams should stop at the stream, and that all such streams should be deemed to be, and remain public highways."

Now these principles are strictly applicable to this case, and in accordance with the facts of this case. The only difference is, the court was there speaking of a navigable river, in this case it appears that the lake, so far as we know anything about it, is non-navigable. But why should that, by any possibility, exclude the plaintiffs from the operation of the principle? One would think that, so far from having that effect, it might be brought within the rule of law in relation to non-navigable streams. The law upon the subject of the survey of land bordering upon navigable and upon non-navigable streams is, that the navigable streams are to remain navigable; that the land covered by the water is not to be sold. The acts of congress require that these streams shall always remain navigable as public highways; and in relation to streams not navigable, the law has always been that the purchaser takes the land to the center of the stream, as is stated by the supreme court in the case of Railway Co. v. Schurmeir, supra. So that, as to navigable streams, the purchaser takes the land only to the border of the stream, with the right, of course, to make improvements upon the stream, as wharves, just as can be done in water courses where the tide ebbs and flows. This is the case of a non-navigable lake, not of a stream, and the question is, whether that changes the principles of the case as stated. So far as we can judge from the statement made in the pleadings, it seems to me that it cannot. In the argument of this case a great many facts have been stated of which the court can take no judicial notice. For example, it is stated that the government, in many cases of these non-navigable lakes, has regarded the land covered by the water as still belonging to the government, and has had it surveyed, and has sold it. Some cases in Missouri are referred to and another on the Calumet river, in Illinois and Indiana. We do not undertake to lay down any absolute rule upon the subject. We do not say but that circumstances might change the principle applicable to such a case as this, but if it be true, as we have the right to assume upon the pleadings that it may be, or is, that the physical condition of this lake has not substantially changed between the time of the survey and the time when this suit was commenced, then it seems clear that the plaintiffs, in obtaining the title to lots 3 and 4 would have the right

to include within the boundary of their land, as that which was sold by the government, all of the extension into the lake.

Whether or not this was the effect of a gradual accretion upon the land, or of some sudden cause, all we can judge from is the facts as they appear from the pleadings. As this lake is only three-quarters of a mile wide, it may be doubtful whether the same rule ought to be applicable to this case as to a larger lake, which, owing to the cultivation of the country or other cause, might dry up gradually or suddenly. For example; the plaintiffs being the owners of all the land on the east and west and southern boundaries of this lake, suppose that there is a gradual withdrawal of the lake, and the bed of the lake bordering upon the plaintiff's land should become dry land, what is to prevent the principle of accretion from operating in such a case as this, where the lake is only three-quarters of a mile wide? Ought there to be any difference in this case from that of a non-navigable stream, so called? Is not this within the spirit of the acts of congress? Whether that would be true of a large body of water where the water gradually or suddenly retired, it is not necessary to decide. It might be supposed in such case that the government did not intend to convey the land covered by the water, but that perhaps is not necessary to be decided in this case. Neither do I feel inclined to decide absolutely as to the rights of the parties in this case.

It may be that if the facts were all known to us, if the changes which had occurred since the time of the survey and the sale, and the time when this suit was brought were known, we might take a different view of the case. But as far as we can at present see, there seems to be no reason for taking this case out of the general rule, where land is purchased bordering upon a non-navigable stream, and where the line is meandered upon the stream for the purpose of quantity, and the stream is intended as the boundary of the land. The uniform rule as to the description of lands in deeds is that the great natural object is to govern, and courses and distances are to yield to the object. The great natural object here was the lake or the water, and the plat shows that the western line of lots 3 and 4 was intended to be the water, and we conclude that the government did not intend to exclude from the operation of the grant which was made to the purchaser, any land between the meandered line and the water, so without actually deciding what may be the ultimate rights of the parties, we must hold that the demurrer is not well taken, and must be overruled. Ordered accordingly.