The Tolleston Club, of Chicago, *et al. v.* The State.

No. 17,265.

THE TOLLESTON CLUB, OF CHICAGO, ET AL. *v.* THE STATE.

SWAMP LANDS.—*Acts of Congress of September 28, 1850, and of March 3, 1857.—Title, When State Acquired.*—The act of Congress of September 28, 1850, usually known as the swamp land grant, was a present grant subject to identification of the specific parcels coming within the description; and the selections confirmed by the act of March 3, 1857, of Congress, furnished this identification and perfected the title. No patent to the State, in fact, was necessary to give it title to such lands.

SAME.—*Lands Along Little Calumet River.—Power of Congress Over After United States Had Parted With Its Title.*—Where swamp lands have once been conveyed to the State by the United States, a subsequent statute of Congress declaring the lands subject to a lien for drainage purposes in favor of a certain drainage company is void. Such was the special act of Congress of 1870, with respect to the land lying along Little Calumet River in Lake and Porter counties.

BOUNDARIES.—*Meander Lines.—Conveyance by Governmental Divisions.*—Meander lines are not boundary lines; and where land is conveyed by a governmental division, the whole divisions, both within and without the meander lines drawn on the original plat—the wet land as well as the dry—passes with the deed; and the fact that the Government's patent specifies the land conveyed as a fractional part of such a division, naming the number of acres, does not change the rule as to the quantity of land conveyed, for the quantity thus named refers to the fact that that division contains only that number of acres of dry land. Where, in such a case, the dry land without the meander is divided into lots, and there is nothing to show that it was intended to bound the lots by the meander, a patent from the State for one of the lots, describing it by its number and section, conveys the whole of such lot to the opposite section line.

SURVEYS.—*Government Surveys.— Conclusiveness.*—The description and plat of the original government survey, filed in the general land office, as made by the surveyor-general from the field notes, are conclusive; and the section lines and corners, as laid down in the description and plat, are binding upon the general government and upon all other parties concerned.

SAME.—*Presumption Concerning Register Following Rules of the Commissioner of the General Land Office.*—The presumption is that a government register of a land office followed the instructions of the commissioner of the general land office.

STATE.—*Bound by the Result of Suit.*—The State, like an individual, is bound by the result of a lawsuit to which it is a party.

From the Lake Circuit Court.

*J. W. Youche, E. D. Crumpacker, J. B. Peterson* and *J. Kopelke,* for appellants.

*A. G. Smith,* Attorney-General, *L. O. Bailey, W. A. Ketcham,* Attorney-General, and *M. Winfield,* for State.

HOWARD, J.—This was an action for the recovery of certain overflowed lands along the Little Calumet river, in Lake county, and was brought against the appellants by the appellee, the State of Indiana.

The land is claimed by the State under provisions of an act of Congress, approved September 28, 1850, acts of Congress, 1850, p. 141, known as the swamp land act, which reads as follows:

"*Be it enacted,* * * * That to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands, made unfit thereby for cultivation which shall remain unsold at the passage of this act, shall be, and the same are hereby, granted to said State.

"Section 2. *And be it further enacted,* That it shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid, and transmit the same to the Governor of the State of Arkansas; and at the request of said Governor cause a patent to be issued to the State therefor; and on that patent, the fee simple to said lands shall vest in the said State of Arkansas, subject to the disposal of the Legislature thereof: *Provided however,* That the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied, exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid.

"Section 3. *And be it further enacted,* That in mak-

ing out a list and plats, of the land aforesaid, all legal subdivisions, the greater part of which is 'wet and unfit for cultivation,' shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it, shall be excluded therefrom.

"Section 4. *And be it further enacted*, That the provisions of this act be extended to, and their benefits be conferred upon, each of the other States of the Union in which such swamp and overflowed lands, known and designated as aforesaid, may be situated."

This act has been interpreted in numerous decisions of the courts, both State and Federal. After a very full examination of these decisions, this court, in the case of *State* v. *Portsmouth Savings Bank*, 106 Ind. 435, reached the following amongst other conclusions:

1. That the act was a present grant to the several States of the swamp lands therein situated.

2. That whether or not any particular tract was or is swamp land, within the terms of the grant, was and is a question for the decision of the secretary of the interior.

3. That the decision of the secretary is final and can not be overthrown by parol evidence.

4. That it is not necessary that this decision should be evidenced by a patent to the State, but it is sufficient that the lands have been selected as swamp lands and such selection approved by the secretary.

5. That when the selection has been so approved and the particular tracts so identified as swamp lands, the title of the State relates back to the date of the grant, September 28, 1850.

From the record it appears that the lands here in controversy were surveyed by the United States surveyors in 1834.

On November 21, 1850, the commissioner of the gen-

eral land office issued instructions for determining what lands fell to the States under the swamp land act.

In these instructions it was said: "This act clearly and unequivocally grants to the several States those lands which, from being swampy or subject to overflow, are unfit for cultivation."

The registers of the local land offices were directed to "make out lists of these lands as early as practicable," according to forms given, "one copy of which," they were told, "you will transmit to the land officers and another to this office."

The officers were further instructed that "The only reliable data in your possession from which these lists can be made out are the [field] notes of the surveys on file in your office; and if the authorities of the State are willing to adopt these as the basis of these lists, you will so regard them."

As to the lands in this case, it was admitted by all the parties, in open court, "that the State of Indiana, in accepting the swamp lands, adopted the same lot numbers as were given in the survey of 1834 for lands bordering upon that impassable morass, and adopted the plats made by the United States surveyors as its plats of swamp lands."

Under date of April 15, 1851, a list of swamp lands selected by the State authorities, including as a part thereof the lands claimed by the State in this action, was reported to the general land office. That list, so far as concerns the lands in question, together with the official certificates accompanying it, is as follows:

"DEPARTMENT OF THE INTERIOR,
"GENERAL LAND OFFICE,
"WASHINGTON, D. C., October 13, 1893.

"I, S. W. Lamoreaux, Commissioner of the General Land Office, do hereby certify that the annexed paper,

The Tolleston Club, of Chicago, *et al. v.* The State.

being a copy of list No. 1 of the swamp land selected in Winamac Land District, Indiana, reported under date of April 15, 1851, in so far as the same relates to lands in township 36, range 8 west, is a true and literal exemplification of the original list on file in this office.

"In Testimony Whereof, I have hereunto subscribed my name and caused the seal of this office to be affixed, at the city of Washington, on the day and year above written.

[SEAL.]     "S. W. LAMOREAUX,

"Commissioner of the General Land Office.

LIST OF SWAMP LAND, WINAMAC DISTRICT.

| PART OF SECTIONS. | SEC. | ACRES. | HDTHS. |
|---|---|---|---|
| Township No. 36, range 8 west: | | | |
| All of 2, 3, 6, 7, 8, 9, 10 and 11 ..................... | ......... | 4,854 | 95 |
| 12, 15, 17, 18, 19 and 20 ................................ | ......... | 2,443 | 67 |
| All of 21 and 22 ........................................ | ......... | 588 | 85 |
| N. W. ¼ ................................................ | 23 | 283 | 20 |

"REGISTER'S OFFICE,

"WINAMAC, IND., April 15, 1851.

"I do hereby certify that I have compared the foregoing selections of lands selected by the State authorities as swamp and overflowed land, agreeable to act of Congress of September 28, 1850, and instructions from commissioner of general land office, dated November 21, 1850, with the township plats on file in this office, reported by the agents of State, under oath, in forty-acre tracts, or quarter-quarter sections, setting forth that the greater portion of each legal subdivision is wholly unfit for cultivation without artificial drainage and falls to the State of Indiana, under the act of September 28, 1850, and believe it to be correct.

"Witness my hand.     DANIEL SIGLER,

"Register."

Doubts having arisen in several cases as to the regularity of the selections of swamp lands made in the several States under the act of September 28, 1850, Congress, by an act approved March 3, 1857, declared, "That the selection of swamp and overflowed lands * * * heretofore made and reported to the commissioner of the general land office * * * be and the same are hereby confirmed, and shall be approved and patented to the said several States."

It is contended by counsel for appellee that by this act of March 3, 1857, Congress fully confirmed the title of the State to the lands here in dispute, being those described in the list hereinbefore set out under certificate of the general land office, to wit: Sections 12, 15, 17, 18, 19, 20, 21, 22, and N. W. ¼ 23; in T. 36, R. 8 W., and that the title of the State to said lands would have been complete on the passage of said act even without the issuance of a patent therefor by the secretary of the interior, inasmuch as the title so confirmed by act of Congress could not fail by reason of any fault or neglect of duty on the part of the secretary.

Counsel for appellants, however, contend that it is not shown that the selection of the lands so made was reported to the commissioner of the general land office prior to March 3, 1857, and consequently was not confirmed by the act of that date.

Turning again to the list of lands, as hereinbefore set out, we find that S. W. Lamoreaux, commissioner of the general land office, under date of October 13, 1893, certifies "that the annexed paper, being a copy of list No. 1 of the swamp land selected in the Winamac Land District, Indiana, reported under date of April 15, 1851, in so far as the same relates to lands in T. 36, R. 8 west, is a true and literal exemplification of the original list on file in this office."

From this certificate it appears that the original list was on file in the general land office on October 13, 1893, and that it was "reported under date of April 15, 1851." That it was reported under date of April 15, 1851, also appears from the date of the register's certificate accompanying the list and certifying that it is a true list of the lands selected by the State. While it is clear, therefore, that the report of the list of lands selected by the State was prepared by the register on April 15, 1851, and also clear that such report and original list is now on file in the general land office and was so on file October 13, 1893, the question remains whether the report and list were on file in that office prior to March 3, 1857, the date of the act confirming the title of the State to lands theretofore "reported to the commissioner of the general land office."

We have seen that in the instructions issued by the commissioner of the general land office, November 21, 1850, the registers were directed to "make out lists of these lands as early as practicable," and to transmit one copy "to this office."

The register who reported the list in this case, "under date of April 15, 1851," states in his certificate that his work was done "agreeable to act of congress of September 28, 1850, and instructions from commissioner of general land office, dated November 21, 1850."

The reasonable presumption is that the register having prepared and certified to the list April 15, 1851, would not retain it in his office until after March 3, 1857. The presumption is also that the officer did his duty, and sent the list to the general land office as soon as it was prepared, agreeable to the instructions received from the commissioner.

The trial court was therefore fully justified in finding as a fact that the list was on file in the general land

office, before the 3d day of March, 1857. In this con-
clusion the court was sustained by reason and legal pre-
sumption. The decision on this point also finds support
in the case of *Martin* v. *Marks*, 97 U. S. 345.

It would seem, therefore, that the title of the State to
the lands described in the list is beyond question. For
as said by the Supreme Court of the United States in
*Martin* v. *Marks*, *supra*, if the list certified to by the
register of the land office at Winamac, "was on file in
the general land office at Washington, March 3, 1857,
we have no doubt that the act completed and made per-
fect the title of the state  *  *  *  to the land in contro-
versy.  *  *  *  The approval of them [the selections] and
the issue of patents to the State, were mere ministerial
acts, in regard to which that department [the United
States land department] had no discretion, unless it was
found that the lands were not vacant, or had actually
been settled on adversely to the swamp land claim.
The act of 1850 was a present grant, subject to iden-
tification of the specific parcels coming within the de-
scription; and the selections confirmed by the act of 1857
furnished this identification, and perfected the title."

But in this case the lands selected by the State, as
shown upon the list reported by the register, were in
fact patented to the State.

On March 3, 1853, in confirmation and approval of
the selection made by the authorities of the State, a
patent to the lands so selected as swamp lands was, at
the request of the Governor, issued to the State, in the
name of the United States.

The patent so issued recited that: "WHEREAS, By the
act of Congress, approved September 28, 1850, entitled
'An Act to enable the State of Arkansas, and other
States to reclaim the swamp lands within their limits,'
it is provided that all the 'swamp and overflowed lands,'

made unfit for cultivation, within the State of Indiana, which remained unsold at the passage of said act, shall be granted to said State; and WHEREAS, In pursuance of instructions from the general land office of the United States, the several tracts or parcels of land hereinafter described have been selected as 'swamp and overflowed lands,' enuring to said State, under the act aforesaid, being situated in the district of lands subject to sale at Winamac, Indiana, to wit: * * * Also, the whole of sections, 2, 3, 6, 7, 8, 9, 10 and 11. The whole of fractional sections 12, 15, 17, 18, 19, 20, 21 and 22. The northwest quarter of fractional section 23. * * *

"Now, therefore, know ye that the United States of America, in consideration of the premises and in conformity with the act of Congress aforesaid, have given and granted, and by these presents do give and grant unto the said State of Indiana, in fee simple, subject to the disposal of the Legislature thereof, the tracts of land above described, etc."

Further contention of counsel is that neither in the list nor in the patent is there a description of the lands which the State claims in this action.

The lands claimed by the State are within the meander lines of the United States survey on each side of the Little Calumet river, being a tract about six miles in length and from about three-quarters of a mile to about a mile and a quarter in width.

In the original field notes of the survey, the region is referred to as a "lake," while on the plat it is marked "impassable marsh."

At the time of the United States survey, in 1834, the territory was completely covered with water, in which, outside the river proper, there was a heavy growth of cat tails, wild rice and other swamp-like products; and there was evidence admitted on the trial, without objec-

tion, that it has been in about the same condition ever since.

Duly certified copies of the field notes and plat of the original survey, as well as of the list and description of the lands, as filed in the general land office, were in evidence.   Such description and plat, as made by the surveyor-general from the field notes, are conclusive; and the section lines and corners, as laid down in the description and plat, are binding upon the general government and upon all other parties concerned.   *Doe* v. *Hildreth*, 2 Ind. 274.

The United States surveyors marked all the section corners, and also ran the north and south lines across the lake or marsh, marking the points of entrance into and exit from the marsh, and also the points on each bank of the river proper, which flowed through the central part of the marsh.

The sections were all numbered regularly, as other sections of a United States survey.   A part of each section lies without and a part within the meander line.

The sections are therefore as completely defined, by corners, section lines and numbers, as any other sections of a United States survey.   The whole territory in dispute, including the river itself, is covered by these sections.   No land or water is left unsurveyed.

All that is peculiar to the survey is, that parts of the sections are without and parts within the meander lines; the parts without the meanders being subdivided into lots, while the parts within are not marked as subdivided.

In the list certified from the General Land Office, as we have seen, the sections in question are described as: "All of 12, 15, 17, 18, 19, 20, 21, 22 and N. W. ¼ 23." There can be no doubt of the meaning of this descrip-

tion. It covers all of the sections named, both within and without the meander lines.

But counsel draw our attention to certain figures, in red ink, placed before the number of each section in the list, as, "592, 12; 360, 70, 15," etc.; and wish us to understand that the list is to be read, "All of 592 acres of section 12," etc., being all of the land in each section outside the meanders.

These red entries are evidently office figures, and were undoubtedly placed in the list to indicate the acres of dry land in the several sections, being the land outside the meander lines. They do not, however, properly speaking, constitute any part of the description of the sections. They simply indicate the dry land, and were of use to the officials and to the purchasers of the land in determining the price that should be paid for it.

As frequently decided, meander lines are not boundary lines, unless expressly made so in the instrument of conveyance. The full title of the grantor to the whole section or other division named, both within and without the meander line, the wet land as well as the dry, passes with the deed. *Doe* v. *Hildreth, supra; Ross* v. *Foust,* 54 Ind. 471; *Ridgeway* v. *Ludlow,* 58 Ind. 248; *Edwards* v. *Ogle,* 76 Ind. 302; *Sphuny* v. *Moore,* 120 Ind. 352; *Stoner* v. *Rice,* 121 Ind. 51; *Brophy* v. *Richeson,* 137 Ind. 114; *Railroad Co.* v. *Schurmeir,* 7 Wall. 272; *Hardin* v. *Jordan,* 140 U. S. 371.

We therefore conclude that the whole section, in each case, was fully described in the list, except as to section 23, of which the northwest quarter was described; and that the title to all of the land so described and listed was confirmed to the State by the act of 1857.

What we have said as to the list applies also in great measure to the patent. The objection to the latter is, that the sections are there described as fractional, and

hence that the patent does not convey the full sections, but only the parts without the meander lines.

The term fractional, as applied to the sections named in the patent, refers simply to the circumstance that they do not contain 640 acres each of dry land. As we have seen, however, the sections were fully surveyed; the corners and boundary lines were determined and recorded in each instance. It follows, from what we have already said, and from the authorities above cited, that the conveyance of the fractional sections carried title to the extreme boundary lines of the sections. All was conveyed. There remained to the United States neither upland nor lowland, whether exposed to the surface or covered by the waters of the marsh or the river. The State took to the section lines.

The issuance of the patent is still further evidence that the swamp lands named were selected by the State, and that such selection was approved by the proper authorities, although the title of the State, even without the patent, was already complete by virtue of the act of Congress. *Edmondson* v. *Corn*, 62 Ind. 17; *Hamilton* v. *Shoaff*, 99 Ind. 63; *Matthews* v. *Goodrich*, 102 Ind. 557.

The chief claim made by appellants to the lands in controversy is based upon a special act of Congress passed in 1870. This act is as follows:

"WHEREAS, There is lying along the Little Calumet river, in the counties of Porter and Lake, in the State of Indiana, a body of land supposed to contain about four thousand acres, which has never been sold or surveyed, and which was described in the original government survey as impassable morass; and,

"WHEREAS, The Calumet Draining Company has been organized under the laws of said State for the purpose

of draining the valley of said river, including said morass; therefore,

"*Be It Enacted, etc.*,That said unsold lands shall be subject to a lien, under the laws of the State of Indiana, for its proper portion of the cost of such drainage, and such lien may be enforced against said lands in the same manner and to the same extent as if the lands were owned by private persons; *provided,* that no claims shall be held to exist against the United States for such drainage.

"SEC. 2. *And Be It Further Enacted,* That said lands may be surveyed (a) and sold (b) to the highest bidder, under the direction of the secretary of the interior, subject to said lien."

From what we have said as to the survey and title to the lands in controversy, it is very clear that the United States had no claim or title to them at the time of the passage of this act. By the swamp land act of September 28, 1850, the title to the lands passed wholly to the State, and, so far as these lands are concerned, the act of 1870 is a nullity.

It needs no argument to show that if the United States had parted with title to the lands in 1850 it could not convey title to the same lands in 1870. This counsel for appellants concede, and it is plainly the law. *Reichart* v. *Felps,* 73 U. S. 160; *Wright* v. *Roseberry,* 121 U. S. 488; *Brophy* v. *Richeson, supra.*

Appellants' claim, therefore, based upon the act of 1870, and mesne conveyances of lots into which the tract in dispute was divided, by the resurvey of the land within the meander lines of the survey of 1834, must fall to the ground. The act of 1870, the resurvey, and sale of lots pursuant to the terms of that act, and all deeds of conveyance made thereunder, are equally void.

However, it is not necessary that appellants should show any title in themselves in order to defeat the title claimed by the State. The State having brought this action for possession, and to quiet its title to the lands, must prove that title good, and it is enough to defeat the claim of the State if the appellants can show that neither the State nor the appellants themselves, the present occupants of the land, are the owners thereof, but that the title is in third parties.

This contention is earnestly made by appellants. They say that if the act of 1870 was void, and if the State acquired good title to the lands under the act of 1850, that title passed from the State when it conveyed the fractional sections along the meander lines, and that those parts of the several sections within the meanders are now owned by the holders of the corresponding parts of the same sections without the meanders.

By the survey of 1834, as we have already seen, the section corners of each of the sections in controversy were located. All boundary lines of the sections were also located, except that lying along the bed of the river, or over the deep water of the marsh or lake; but the ends of this line, the corresponding corners of the section, having been located, the line itself became thus determined, and might be drawn upon the plat. *Doe* v. *Hildreth, supra,* at p. 277; section 2396, R. S. U. S.

The field notes show that the whole territory now in dispute was covered with water. In these field notes the locality is always referred to as the "lake," the "river" or the "water," and sometimes as "river or lake"; while the river proper is referred to as "main channel," or "the river flowing through the lake."

The only meander lines run, the only ones that could be run on account of the water, were the meanders which include the territory now in question.

The field notes of the meander line on the west side are headed: "Meanders of Calumic river from post in west boundary (of township), thence up stream on right bank."

And, for the meander line on the east side: "Meanders of the Calumic river from post on east boundary (of township), thence down stream on left bank."

The meander lines thus described inclose all the land here claimed by the State. The river, or channel proper, was not otherwise meandered; the intersection of its banks with the north and south section lines only being located.

The territory within the meanders was then, and has continued to be ever since, covered with water during the greater part of the year. The field notes state that the water was then from one to ten feet deep.

The meander lines crossing the sections were not made boundary lines in the list of swamp lands certified from the general land office, nor in the patents given by the State when the fractional sections were sold. The sections, as surveyed, were conveyed to the State.

The plat of the survey shows that the parts of the sections outside the meander were divided into "lots," which were numbered separately for each section.

The patents made by the State, in most instances, show a conveyance of these "lots" by their number and section.

Indeed it was admitted on the trial by all parties, in open court, "that the State of Indiana, in accepting the swamp lands, adopted the same lot numbers as were given in the survey of 1834, for lands bordering upon that Impassable Morass, and adopted the plats made by the United States surveyors as its plats of swamp lands, and that the lands afterwards sold by the State of Indiana as swamp lands along and bordering this 'Impassa-

ble Morass' were sold according to surveys and plats which were exact copies of the survey and plats, including numbers of lots, dimensions and acreage of same, as marked thereon, made by the United States surveyors at the original survey of 1834.''

If the State sold the sections by their numbers simply, as given in the general land office list, or as fractional sections, as named in the patent from the United States, there would be little question that the entire sections were conveyed. Even if the parts between the meander lines were all sold, as some of them were, as quarter or quarter-quarter sections, or by some other exact subdivision, there would be as little doubt that the subdivision so named would be fully conveyed. This counsel tacitly admit. But because the sales made by the State were in most cases made by lot numbers it is argued that only the dry land outside the meander line was conveyed.

As already said, a meander is not a boundary unless expressly made so. If the meander line in this case were actually, or by necessary implication, made a boundary of the lands sold, it is, of course, evident that such boundary would stand just as any other boundary named or described. Such was the case in *Edwards* v. *Ogle,* 76 Ind. 302; also in *Brophy* v. *Richeson,* 137 Ind. 114, both already cited.

But, by the admission made at the trial, and from an examination of the State patents in the record, it appears that the meander was not made a boundary line in the sales made by the State. On the contrary, the State, in making its sales, adopted the plats and lot numbers of the United States survey, with dimensions, acreage and numbers, all as made in the original survey of 1834.

It seems very clear that whatever the State received from the United States, she conveyed fully in her

patents to the purchasers of the same lands, all described as in the survey, upon which she bases her own claim to the lands.

Section 20, for example, in this survey, was divided into four lots, numbered 1, 2, 3 and 4. If the land were sold as section 20, or as lots 1, 2, 3 and 4 of section 20, there could hardly be any doubt that the purchaser would acquire all that the State could convey within the four section lines. The principle, however, could not be different if one or two of the lots were sold separately. The lot lines, if extended to the opposite line of the section, would bound the purchase. The meander could have nothing to do with the matter; as that is used, not as a boundary, but to indicate the quantity of dry land, and to mark the limit where it was possible for the surveyors to work. All beyond was "water," "lake," "river," or "impassable marsh."

It may be observed that the riparian doctrine, strictly speaking, does not apply here. In none of the conveyances was the land bounded by the river, by the lake or by the morass, if there is such a thing as a meander of a marsh or morass. No survey was made to or abutting on the river or its meander. The sections were surveyed in full, each one mile square and containing 640 acres. The sections or parts of sections sold, therefore, extend, not to the morass or to the river, but to the opposite section lines.

Were the survey, or any of the land bounded on the river, the lake or the morass, then undoubtedly the riparian doctrine would apply, and the land described would extend to the thread of the Little Calumet, or Calumic River. As it is, all the land is bounded by section lines.

We are, therefore, of opinion that the State received good title to all the land in controversy by virtue of the

act of Congress of 1850, and that the State, in selling this tract, conveyed to its grantees all the land so received, in the respective sections, both within and without the meander lines. This conclusion we are satisfied is fully sustained by the authorities cited. So far as this controversy is concerned, the land does not belong to either of the parties to the action.

The judgment is reversed, with instructions to grant a new trial, and for further proceedings not in conflict with this opinion.

Filed Sept. 26, 1894.

## ON PETITION FOR A REHEARING.

HOWARD, J.—With their petition for a rehearing of this case, counsel for appellee have filed a very earnest and able brief, to which reply has been made by counsel for appellants. Other briefs have also been filed on both sides.

Appellee's principal contention now is, that "the court erred in holding that the swamp land in controversy had been surveyed either by the government of the United States or by the State of Indiana, at the time of the sale of such border lots" by the State.

It seems to us that this is dangerous ground for appellee to stand upon.

We think it was shown in the original opinion that the lands in question were surveyed by the United States government in 1834. The several sections were surveyed and numbered by the deputy surveyors, and this is all that is required by law to be done in the field. The remaining work may be done in the office.

By the third clause of section 2395, R. S. of the United States, it is provided that: "The township shall be subdivided into sections, containing, as nearly as may be, six hundred and forty acres each, by running through the

same, each way, parallel lines at the end of every two miles; and by making a corner on each of such lines, at the end of every mile. The sections shall be numbered respectively, beginning with the number one in the northeast section and proceeding west and east alternately through the township with progressive numbers till the thirty-six be completed.''

For cases where boundary lines and corners have not been, or could not be, actually run or fixed, provision is made in clause second of section 2396, of the same statutes, as follows:

''The boundary lines, actually run and marked in the surveys returned by the surveyor-general, shall be established as the proper boundary lines of the sections, or subdivisions, for which they were intended, and the length of such lines, as returned, shall be held and considered as the true length thereof. And the boundary lines which have not been actually run and marked shall be ascertained, by running straight lines from the established corners to the opposite corresponding corners; but in those portions of the fractional townships where no such opposite corresponding corners have been or can be fixed, the boundary lines shall be ascertained by running from the established corners due north and south or east and west lines, as the case may be, to the watercourse, Indian boundary line, or other external boundary of such fractional township.''

In connection with these statutes, it is said, in Matthews' Guide to the Public Lands, p. 114, that: ''The sections of one mile square are the smallest tracts, the outboundaries of which the law requires to be actually surveyed. Their minor subdivisions, represented in lines drawn on the township plats, are not surveyed and marked in the field. They are defined by law, and the surveyors-general, in protracting township plats from

the field notes of sections, merely designate them in red ink, the lines being imaginary, connecting opposite quarter-section corners in each section from south to north, and from east to west. * * * This convenient mode of subdividing sections with a view to economy and to facilitate sales of small tracts, although not actually marked on the ground by metes and bounds, yet under laws of Congress are susceptible of demarkation by any surveyor in the different States and territories in accordance with the field notes of the original survey made by the United States officers.''

To make a legal survey in this case, therefore, it was only necessary to actually run the section lines every two miles, to mark a corner on each of such lines at the end every mile, and to number the several sections. Even of more than this was actually done by the surveyors in the field. The law then provides a means for ascertaining ''boundary lines which have not been actually run and marked,'' namely, ''by running straight lines [on the plats in the land office] from the established corners to the opposite corresponding corners.'' With these provisions of the law, with the two-mile parallel lines actually run, and the eighty chain, or mile, corner points marked on each line, any surveyor, using the original field-notes, could have no trouble in locating the several lines, corners and subdivisions. The land in controversy was therefore surveyed into sections, as provided by law, by the United States government surveyors, in 1834.

But even if we were mistaken in this, it would, as we have said, be a dangerous contention for appellee to undertake to show that such survey was not made.

The swamp land act of 1850, under which the State claims title, requires that the lands should be selected, and the selections approved by the Secretary of the In-

terior, as swamp lands. The land in dispute consists of parts of surveyed sections of land, selected, approved, and certified from the general land office of the United States. The land so selected is described as in "Township No. 36, Range 8, west," and being "All of * * * [sections] 12, 15, 17, 18, 19 and 20. All of 21 and 22, [and] N. W. ¼ 23."

But if there were in fact no survey, then no such sections would exist, at least between the meanders of the Calumet river, and so no selections would ever have been made by the State or approved by the Secretary of the Interior. The consequence would be that the State had never received title, and the unsurveyed lands having remained in possession of the general Government, were correctly surveyed and sold under the act of Congress of 1870. If, therefore, we should admit this main contention of counsel for appellee, the consequence would inevitably follow that the State had never acquired title to the land in dispute. We are satisfied, however, that the conclusions reached in the original opinion, that the lands were surveyed in 1834; that they were selected and the selections approved under the swamp land act of 1850; that the State, therefore, acquired good title under that act; and that the act of 1870, with the resurvey and sales thereunder was a nullity, are all correct; and we are quite unable to understand why counsel should here insist upon a contention which, if agreed to, would cut the ground entirely from under their own feet.

The other principal contention of counsel for appellee in this petition is that the meanders of the Calumet river are boundaries of the marginal lots in the several sections as sold by the State. This can not be admitted. It is contrary to all the authorities. Meanders are not boundary lines unless expressly made so in the instruments of conveyance.

In the present case had the marginal lots along either side of the river been sold without reference to the sections, the purchasers would most certainly have taken title, not to the meander simply, but to the thread of the stream. This, too, is according to the practice and instructions of the land department, to which counsel refer so confidently.

Secretary of the Interior Vilas, February 27, 1888, on the petition of James Hemphill for the survey of a point of land, or island, extending beyond the meander line into Goose Lake, in Michigan, held, quoting from *Railroad Co.* v. *Schurmeir, supra* (286), that "Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers [and as well upon inland lakes of water], not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as a means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser"; and hence that the application for a survey of the point of land beyond the meander should be denied; that is, in effect, that the title to the point of land in question was in the owner of the adjacent land within the meander line. See, also, decision of the commissioner of the general land office of November 28, 1884; and decision of Secretary Teller, July 11, 1883.

In the latter, an Indiana case, it is said: "The grants made by the Government of the lands lying on the lake are not limited by the meander line, but extend at least to the permanent waters of the lake."

In the case of *Railroad Co.* v. *Schurmeir, supra,* it is said further by the Supreme Court of the United States, that "In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows, to a demonstration, that the water-

course, and not the meander line, as actually run on the land, is the boundary.   Proprietors, bordering on streams not navigable, unless restricted by the terms of their grant, hold to the center of the stream.''

The Schurmeir Case has been the leading authority on this subject since the delivery of the opinion of the court.

In the case of *Forsyth* v. *Smale,* 7 Biss. 201, Judge Drummond, citing *Railroad Co.* v. *Schurmeir, supra,* stated the rule in like manner as to meander lines, holding that, ''in relation to streams not navigable, the law has always been that the purchaser takes the land to the center of the stream''; and that ''where land is purchased bordering upon a nonnavigable stream, and the line is meandered upon the stream for the purpose of quantity, and the stream is intended as the boundary of the land, the grant includes any land between the meandered line and the water.''   See, further, Gould on Waters, section 78, and notes; Angell on Watercourses, section 10, and following sections and notes.

In *Jones* v. *Janney,* 8 W. & S. (Pa.) 436, 42 Am. Dec. 309, it was held that a ''conveyance of lands bordering on flats of river., passes the flats as appurtenances, unless they are expressly excluded.''   See, also, *Ashby* v. *Eastern R. R. Co.,* 5 Met. (Mass.) 368, 38 Am. Dec. 426.

In *Felder* v. *Bonnett,* 2 McMull. Law (S. C.) 44, 37 Am. Dec. 545, the court held that a survey calling for boundary designated as ''Dean Swamp,'' includes land to flowing stream or current of swamp where such exists, and does not extend merely to external line of low and marshy ground.

In *Kraut* v. *Crawford,* 18 Iowa 549, 87 Am. Dec. 414, the court held that a meander line is not a boundary line.   Citing *Middleton* v. *Pritchard,* 3 Scam. 510, 38 Am. Dec. 112, ''where it was decided that the riparian

proprietor owned the low ground or peninsula outside of the meander line."

Even, therefore, if the land had not been fully surveyed, and the section lines and corners were not all determined, as urged by counsel for appellee; and even if the survey terminated on the banks or edge of the morass on each side of the river, still the parties purchasing the lots abutting upon this morass, or the meander line, would take to the middle or thread of the stream. Nor can reservations be implied, in case of conveyances of lands along streams. "When, therefore, the government has surveyed its lands along the bank of a stream, and has sold and conveyed such lands by governmental subdivisions, its patent conveys the title to all islands lying between the meander line and the ¦middle thread of the river, unless previous to such patent it has surveyed such islands as governmental subdivisions, or expressly reserved them when not surveyed." *Butler* v. *Grand Rapids, etc., R. R. Co.,* 85 Mich. 246, 24 Am. St. Rep. 84, and cases there cited.

Nor will it do, especially in view of the foregoing authorities, for counsel to say that the meanders in the case before us are not meanders of the river. The field notes show that the whole territory between the meander lines was covered with water; while the evidence shows that it is still so covered. The river, so called, was the central or flowing part of this body of water. Meander lines, from their very nature, being intended to mark the sinuosities of a stream, are run as close to the water as can conveniently be done by the surveyors. In this case, as the field notes show, the meanders could not be run any closer to the river than they were actually run. In addition to this, the field notes actually name the lines as meanders of the river, the language used being: "Meanders of Calumic River."

The meander is, therefore, merely a mark for the line of the river, being laid off as near to the river bank as the surveyors could work. It means the river, and is not itself a boundary, but only indicates the location of the true boundary, which is the river itself. If, therefore, we proceeded on the theory of the appellee, we should still have to hold that the lands in controversy belonged to the owners of the border-lots on each side of the river.

But, as in fact, the contention of the appellee that the land was not surveyed is not true, but the whole tract was surveyed into sections of land, and the border-lots sold as lots of those sections, we held in the original opinion, and still hold, that the title of the purchasers of these border-lots extended to the opposite lines of the sections. There was nothing else to limit them, the stream itself being included in the lines of the survey.

We may here remark that so far as concerns the marginal lots, the Beaver Lake cases (*State* v. *Portsmouth Savings Bank*, 106 Ind. 435, and *State* v. *Milk*, 11 Biss. 197) are not in point. Beaver Lake was a large body of water of shallow depth, which had not been surveyed by the United States government. Indeed, the cases themselves are authorities for the conclusions here reached. In the *State* v. *Milk*, *supra*, it is said: "That while a general grant of land on a river or stream, nonnavigable, extends the line of the grantee to the middle or thread of the current, a grant to a natural pond or lake, extends only to the water's edge," citing numerous authorities.

Counsel dwell also on the equities of the case, the superior rights of the State, the absence of any title in the Tolleston Club, as shown by the record, that the State and the purchasers of the border-lots have treated the conveyances by the State as covering but such bor-

der-lots, and that the statute of limitations has already run against the border-lot owners. The record is silent on all these matters; and the rights of all parties, even those of the august commonwealth, must be determined from the record alone. We have nothing else to guide us. The decision of the court does not affect any rights which the State or the border-lot owners may have in relation to any of these matters. So far as any rights which the State or border-lot owners may have as to the manner in which the State and the border-lot owners have treated the sales made by the State, such questions, if properly presented, may be considered on the return of the case to the trial court.

The appellants Flora N. Biggs and John G. Earl ask that the original opinion be modified so as to give them title to the lands claimed by them. In so far as these appellants claim title through purchase from the United States or from the State of Indiana of lots or lands along the margin of the Calumet river, according to the United States survey of 1834, together with the parts of the land in controversy, lying within their east and west lines, and extending, in case of "lots" to the opposite sides of their respective sections, and, in case of other subdivisions, to the opposite sides of such subdivisions,—such claims of title are upheld by the original opinion. In so far, however, if at all, as their claims are based upon the void survey of 1870, and conveyances thereunder, the claims can not be upheld, unless protected by the statute of limitations.

The petition for a rehearing is overruled.

Filed April 26, 1895.